IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

FILED

JAN 2 3 2015

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

SAIED EMAMI,                                )
                                            )
        Plaintiff,                          )
                                            )
v.                                          )   Civil Action No.: 2:15CV34
                                            )
CHARLES F. BOLDEN, JR.,                     )
IN HIS OFFICIAL CAPACITY AS                 )   JURY TRIAL DEMANDED
ADMINISTRATOR,                              )
NATIONAL AERONAUTICS AND                    )
SPACE ADMINISTRATION                        )
300 E Street Southwest                      )
Washington, D.C. 20546,                     )
                                            )
SERVE: Dana J. Boente                       )
        United States Attorney              )
        600 E. Main Street, Suite 1800      )
        Richmond, Virginia 23219-2430       )
                                            )
and                                         )
                                            )
KENNETH E. ROCK,                            )
Individually,                               )
                                            )
            Defendants.                     )
                                            )

**COMPLAINT**

COMES NOW the Plaintiff, Saied Emami, Ph.D (hereinafter, "Emami" or "Plaintiff"), by

counsel, and as his Complaint against the the Defendants, Charles F. Bolden, Jr., in his official

capacity as Administrator of the National Aeronautics and Space Administration (hereinafter,

"NASA"), and Kenneth E. Rock, in his individual capacity, states as follows:

<u>**NATURE OF ACTION**</u>

1.     In this Complaint, Emami alleges employment discrimination based on national origin (Iranian) and religion (Islam) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et. seq. (hereinafter, "Title VII") against his former employer, NASA.

2.     Emami also alleges retaliation in violation of Title VII against NASA.

3.     This Complaint also includes claims of tortious interference with contract and tortious interference with contract expectancy against Kenneth E. Rock (hereinafter, "Rock"), individually, under Virginia's common law.

4.     In his claims against NASA, Emami seeks a declaratory judgment, injunctive relief, back pay, reinstatement or front pay, compensatory damages, attorneys' fees, the costs of this action, and any other relief the Court may deem to be proper and just.

5.     In his claims against Rock, Emami seeks actual damages, compensatory damages, punitive damages, and any other relief the Court may deem to be proper and just.

6.     NASA discriminated against Emami by subjecting him to a Performance Improvement Plan (hereinafter, "PIP") and terminating his employment because of his national origin (Iranian) and his religion (Islam).

7.     NASA retaliated against Emami by subjecting him to a PIP and terminating his employment because he engaged in protected activity by complaining to Rock, Rock's supervisors, NASA's Equal Employment Opportunity Office (hereinafter, "EEO Office"), and the Office of Human Capital Management (hereinafter, "OHCM"), that Rock and others within NASA were discriminating against him.

8.     Rock and others within NASA's management have claimed that they subjected Emami to the PIP and terminated his employment because he failed to satisfy one element of his 2012-2013 Performance Plan.

9.     Prior to the 2012-2013 year, Emami had never been accused of failing to meet NASA's expectations, and had obtained excellent ratings on each performance review.

10.    An objective review of Emami's work product reveals that Emami's performance, including his performance during the 2012-2013 year, met or exceeded NASA's legitimate expectations, and that Rock's claims regarding Emami's performance were a pretext intended to conceal discrimination and retaliation.

11.    Rock intentionally made false and otherwise defamatory statements regarding Emami's performance, capabilities, and professionalism from January 18, 2013 until June 27, 2013. Rock's made these statements with malice. Prior to Rock's defamatory actions, Emami was employed by NASA, and was reasonably certain to maintain his employment. Rock's intentional, tortious, and otherwise improper conduct directly caused Emami's termination.

12.    As described below, NASA's conduct toward Emami constitutes unlawful national origin and religious discrimination and retaliation in violation of Title VII.

13.    Rock's conduct constitutes tortious interference with contract and tortious interference with contract expectancy.


## PARTIES

14.    The Plaintiff, Dr. Saied Emami, is a citizen of the United States of America who resides at 103 Lakepoint Place, Yorktown, Virginia 23692.

15.     At all times relevant to this Complaint, Emami was employed by NASA as a GS-13 level Aerospace Engineer at the Langley Research Center in Hampton, Virginia.

16.     Defendant Charles F. Bolden, Jr. (hereinafter, "Bolden") is the head of NASA, a federal agency charged with carrying out a set of programs in human space flight, aeronautics research, and scientific research. See 51 U.S.C. § 20301(a) (Bolden and NASA are referred to collectively herein as "NASA").

17.     NASA is an "executive agency," and is therefore subject to Title VII. See 42 U.S.C. § 2000e–16(a).

18.     Defendant Rock is the former Branch Head of NASA's Hypersonic Airbreathing Propulsion Branch at the Langley Air Force Base in Hampton, Virginia.

19.     Rock was directly responsible for the termination of Emami's employment.

**JURISDICTION AND VENUE**

20.     This Court has jurisdiction over the claims asserted against NASA pursuant to 28 U.S.C. § 1331 because these claims arise under the laws of the United States of America, namely, 42 U.S.C. § 2000e-16(a), 42 U.S.C. § 2000e-16(c), and 42 U.S.C. § 2000e-5; pursuant to 28 U.S.C. § 1343 because Title VII is an "Act of Congress providing for the protection of civil rights;" and pursuant to 42 U.S.C. § 2000e–5(f)(3), which authorizes an aggrieved person to bring suit against the United States.

21.     This Court has supplemental jurisdiction over the claims asserted against Rock under 28 U.S.C. § 1367(a) because they are so related to Emami's Title VII claims that Emami's claims against NASA and his claims against Rock "form part of the same case or controversy under Article III of the United States Constitution."

22.    Defendant NASA is subject to personal jurisdiction in this District because NASA operates facilities at the Langley Air Force base (hereinafter, "Langley") in Hampton, Virginia, and the adverse actions which are the subject of this Complaint took place at NASA's facilities at Langley.

23.    Defendant Rock is subject to personal jurisdiction in this District because he has purposefully established minimum contacts with the Eastern District of Virginia.

24.    The unlawful employment practices alleged herein occurred within the Eastern District of Virginia, in the Norfolk Division. Venue is therefore proper pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e–5(f)(3).

<u>**EXHAUSTION OF ADMINISTRATIVE REMEDIES**</u>

25.    Emami has exhausted his administrative remedies, as required by Title VII, in the following manner:

   a.  Emami's supervisor, Kenneth Rock, issued a Notice of Proposed Removal to Emami on April 12, 2013;

   b.  Emami's removal was upheld by Deputy Director Damador Ambur (hereinafter, "Ambur") on June 21, 2013;

   c.  Emami appealed his termination to the Merit Systems Protection Board (hereinafter, "MSPB") in a timely manner;

   d.  In his appeal, Emami alleged discrimination on the basis of national origin and religion in violation of Title VII. He also alleged retaliation in violation of Title VII;

e. MSPB Administrative Judge Andrew Niedrick issued his ruling, which included a decision on Emami's Title VII claims, on November 20, 2014, which became final on December 25, 2014; and

f. This Complaint has been filed within 30 days of December 25, 2014, when the MSPB decision became final.

## FACTUAL ALLEGATIONS

26. Emami is a 58-year-old citizen of the United States of America.

27. Emami was born in Kashan, Iran. He immigrated to the United States in the 1970s, and became a U.S. citizen in 1988.

28. Throughout his life, Emami has openly practiced the Muslim religion, Islam.

29. Emami was hired by NASA on October 7, 2002 to work as a GS-13 Aerospace Engineer in the Hypersonic Airbreathing Propulsion Branch, Research Directorate (hereinafter, "Directorate").

30. Emami was highly qualified for his job as a Research Aerospace Engineer, possessing the necessary skills, education, experience, knowledge and expertise to fulfill all of his job duties.

31. Emami received a B.S. in Mechanical Engineering from Texas A&M University in 1981. He received a M.S. from Texas A&M in 1984.

32. Emami received his Ph.D. in Mechanical Engineering from Texas A&M University in 1988.

33. Emami taught at Texas A&M until 1988. During his employment with Texas A&M, Emami was recognized as an effective teacher and communicator, until 1988.

34.     Upon receiving his Ph.D., Emami was hired by General Dynamics, where he worked from 1988 to 1991, supervising three employees and directing the operations of the Hypersonic Exhaust Propulsion System of General Dynamics' National Aerospace Hypersonic Program.

35.     Emami was hired by the Lockheed Martin Corporation in 1991.

36.     From 1996 to 2002, Emami was the Principal Engineer and Section Supervisor for a group of seven engineers at Lockheed Martin who were under contract with NASA's Langley Research Center.

37.     From 1991 to 2002, Emami distinguished himself by assisting NASA with its hypersonic propulsion airbreathing systems, including research and testing related to NASA's advanced airbreathing dual-mode hydrogen fueled scramjet engines.

38.     As a result of his exceptional work with NASA during his employment with Lockheed Martin, Emami was offered a job with NASA in 2002.

39.     Emami was removed from his position on August 12, 2013 by his immediate supervisor, former Branch Head Kenneth Rock.

40.     Prior to his termination, Emami complained that Rock and others at NASA discriminated against him because of his national origin and religion. Emami directed these complaints to Rock, to Rock's supervisors, to the OHCM, and to NASA's EEO Office.

### Emami's Job Performance

41.     As discussed below, at all times during his employment with NASA, Emami's job performance met NASA's legitimate expectations.

42.     From the date of his hire until January 2013, Emami was never subject to any kind of disciplinary action.

43.     In every evaluation period from 2002 until 2012, NASA rated Emami as either "Meets or Exceeds Expectations or "Fully Successful" (the equivalent of "Meets or Exceeds Expectations" after NASA changed its rating system).

44.     During the 2002-2003 evaluation period, Emami received a rating of "Meets or Exceeds Expectations."

45.     During the 2003-2004 evaluation period, Emami again received a rating of "Meets or Exceeds Expectations."

46.     During the 2004-2005 evaluation period, Emami again received a rating of "Meets or Exceeds Expectations."

47.     During the 2005-2006 evaluation period, Emami received a rating of "Meets or Exceeds Expectations." Emami received a "Significantly Exceeds Expectations" rating on Element #6 of the evaluation – "Hypersonic Engines Performance Evaluation through High Frequency Data Acquisition and Signal Analysis."

48.     During the 2006-2007 evaluation period, Emami again received a rating of "Meets or Exceeds Expectations."

49.     During the 2007-2008 evaluation period, Emami received a "Fully Successful" rating. He received an "Exceeds Expectations" rating on Element #4 of his evaluation.

50.     Element #4 involved performance of the following duties: representation of the Directorate on the Innovation Assessment Panel as a technology expert; reviewing and assessing Langley's intellectual assets and invention disclosures; interviewing other experts; reviewing technological developments to determine their value in protecting U.S. industry; determining whether to seek patents on valuable technology; consultation with NASA's Patent Counsel;

participation in panel discussions; and evaluating technologies submitted by outside entities for use in NASA missions.

51.     During the 2008-2009 evaluation period, Emami received another "Fully Successful" rating. He also received an "Exceeds Expectations" rating on Element #4 of the evaluation, described above.

52.     During the 2009-2010 evaluation period, Emami received a "Fully Successful" rating.

53.     During the 2009-2010 evaluation period, Emamai, received a "Significantly Exceeds Expectations" rating on Element #4 of his evaluation.

54.     During the 2010-2011 evaluation period, Emami received a "Fully Successful" rating. Once again, Emami received a "Significantly Exceeds Expectations" rating on Element #4 of the evaluation.

55.     Emami also received an "Exceeds Expectations" rating on Element #5, "Creativity and Innovation" in 2011.

56.     During the 2011-2012 evaluation period, Emami received a "Fully Successful" rating. Once again, Emami received a "Significantly Exceeds Expectations" rating on Element #4 of the evaluation, and an "Exceeds Expectations" rating on Element #5.

57.     During each evaluation period from 2002 to 2012, Emami's reviews reflected that NASA believed that he collaborated well with other employees and maintained cooperative and respectful working relationships with them.

58.     During each evaluation period from 2002 to 2012, NASA specifically noted in Emami's reviews that: "[o]ral and written communications are open and honest, yet aware of and sensitive to individual and cultural differences;" "[i]nformation is usually accurate and effectively presented;" "[w]ritten materials generally follow NASA's prescribed standards and style and are

infrequently returned for substantial revision;" and "[o]ral communications are generally courteous (e.g., shows respect, listens well, and responds appropriately."

59.     During each evaluation period from 2002 to 2012, Emami received a "step increase" in his compensation from NASA based on his excellent ratings and satisfaction of NASA's expectations.

60.     With the sole exception of Rock, who consistently demonstrated undue hostility toward him, Emami worked well with all of his colleagues and supervisors.

61.     Regarding Emami's friendly, cooperative, and collaborative relationships with his coworkers, Assistant Branch Chief Shelly Ferlemann (hereinafter "Ferlemann") made the following statement:

> Dr. Emami has served as an RTD representative on the NASA LaRC innovative Assessment Panel. Saied has effectively utilized his combined technical and patent law knowledge and expertise to serve NASA and LaRC in matters concerning intellectual property. Statement by another IAP member, "I believe Saied is a highly valued member of the assessment panel because he has a rare combination of technical breadth/ depth and legal / business understanding. Unlike some other contributors on the panel, he always comes prepared with insightful comments about each of the inventions reviewed. We all value his ideas and input and would say virtually all actions taken by the committee occur only with agreement by Saied. If there are disagreements, he is skilled in making his position understood without creating any disharmony on the panel. His opinion is highly respected. I certainly enjoy working with him in this area, as do others."

62.     During his ten years of employment with NASA, Emami was never aware of any criticism regarding his manner of communication, except from Rock.

63.     As discussed in further detail below, Rock manifested an intense hostility toward Emami from the time he was appointed to be the Branch Head until he finally fabricated a performance-based pretext to terminate Emami's employment.

### Rock's Hostility toward Emami

64.    Rock was appointed as the Branch Head over Emami's Directorate in 2005.

65.    During a discussion with Emami on April 23, 2009, Rock became angry with Emami after Emami expressed disagreement with a statement made by Rock.

66.    Rock responded to Emami's disagreement by criticizing and asking, "Don't you like this country?"

67.    As an expatriate who had sacrificed a great deal to demonstrate his devotion to the United States, Emami was highly offended by Rock's comment.

68.    Similarly, in 2011, Rock told Emami, "You people are combative."

69.    Emami understood this offensive generalization to be a reference to Iranian people and Muslims.

70.    Emami reported Rock's conduct to the EEO Office and OHCM on several occasions from 2009 to 2013.

71.    During his conversations with these offices, Emami informed the EEO Office and OHCM that he believed Rock was biased against him because of his national origin (Iran) and his religion (Islam). He also told the EEO Office and OHCM about Rock's offensive statements.

72.    No action was taken to address Rock's animosity toward Emami, and Rock continued to treat Emami in a hostile manner.

73.    In March 2012, Rock suddenly and inexplicably claimed that Emami did not have an "approved" Individual Development Plan ("IDP"). In truth, Rock himself had previously approved Emami's IDP.

74.    From 2009 to 2012, Rock cut the funding for several of Emami's projects and travel, thus depriving him of vital professional opportunities.

75.     During the same period, Rock fully funded the projects and travel of the other researchers in the Branch.

76.     In addition, Rock frequently issued Emami vague, general assignments, and then refused to meet with Emami to discuss the details of the assignments.

77.     Rock's actions, combined with NASA's rejection of each of Emami's applications for professional advancement, caused Emami a great deal of concern and distress.

### NASA's Pattern of Unequal Treatment Toward Emami

78.     Throughout his employment with NASA, Emami applied for numerous promotions, transfers, and details that would have benefitted his career.

79.     In each instance, NASA indicated that Emami was qualified for the promotions, transfers, and details for which he applied.

80.     Emami was not selected for any of the promotions, transfers, or details for which he applied. Instead, those positions were given to less qualified employees who were not Iranian-American or Muslim.

81.     Rock and other NASA employees claimed that Emami was "not a good fit" for the promotions, transfers, or details for which he applied because he "speak[s] with an accent" and has "communication problems." These statements were made directly to Emami, and to the individuals responsible for awarding the promotions, transfers, and details mentioned above.

82.     Among the positions Emami sought was a congressional detail to NASA's Office of Legislative Affairs.

83.     Prior to applying for the congressional detail, Emami obtained a significant amount of legal knowledge by studying for and passing the U.S. Patent Bar Exam.

84.     Believing that he could utilize his legal and scientific knowledge, experience and passion to benefit NASA by working with Congress, Emami repeatedly requested the congressional detail from 2008 until 2010.

85.     Based on his interest in working with Congress, Emami sought additional training that would make him more suited to the congressional detail, but Rock refused to permit Emami to obtain such training.

86.     Rock refused to recommend Emami for the detail to the Office of Legislative Affairs, or to even inform the Office of Legislative Affairs that Emami was interested in the detail.

87.     After Rock failed to submit Emami's application to the Office of Legislative Affairs, Emami contacted the Office directly to inform them of his interest.

88.     The Office of Legislative Affairs eventually canceled the congressional detail in 2010, claiming that they had found "no interested applicant."

89.     Emami has reason to believe that Rock and the other employees who prevented him from serving in the congressional detail did so because he is from Iran and is a Muslim.

90.     Being forced to watch NASA promote other, less-qualified, non-Iranian and non-Muslim employees over him for so many years caused Emami to feel demeaned and humiliated.

## 2012-2013 Performance Plan

91.     In July 2012, Emami prepared his Performance Plan for the 2012-2013 period (hereinafter, "Plan") and submitted it to Rock.

92.     Rock made substantial changes to Emami's Plan. In reviewing Rock's changes, Emami noted that Rock's version of the Plan would effectively require him to accept responsibility for the functionality of the Isolater Dynamics Research Lab ("IDRL"), a new research facility that was not yet operational.

93. Emami strongly objected to Rock's version of the Plan. In an e-mail to Rock, he stated,

> I do not desire to set my self up to fail; I do not desire to sign your proposed plan. This is just due to the nature and meaning of the research, and further I will be working in an environment where "ownership of processes" is not under my control.

94. Emami met with Rock and attempted to explain to Rock that his Plan was not reasonable. Rock ignored Emami's objections, however, and compelled him to sign the Plan.

95. During the 2012-2013 year, Emami performed all of the tasks assigned to him to the fullest extent possible during the time that the IDRL was not operational.

### IDRL Operations Issues

96. Construction on the IDRL began very slowly in 2011.

97. The functionality of the IDRL centered around the operational status of a Test Apparatus.

98. Research Project Lead Troy Middleton (hereinafter, "Middleton") was responsible for the construction, operation, and configuration of the Test Apparatus.

99. Other engineers and researchers who were responsible for substantial parts of the IDRL project included: Jeff Balla, Principal Investigator for Laser-Based Measurements (hereinafter, "Balla"); Rob Baurle, Principal Investigator for CFD Modeling (hereinafter, "Baurle"); Lloyd Wilson, Technical Lead for Systems Integration (hereinafter, "Wilson"); and Dave Witte, Lead for Experimental Techniques (hereinafter, "Witte").

100. At all times relevant to this Complaint, Middleton, Balla, Baurle, Wilson, and Witte were employed at the GS-14 level or higher.

101. Middleton, Balla, Baurle, Wilson, and Witte are all non-Iranians.

102. Middleton, Balla, Baurle, Wilson, and Witte are all non-Muslims.

103. Critical Job Element #1 (hereinafter, "CJE #1") of the 2012-2013 Plan Rock issued to Emami states that Emami was required to "Support Research in the [IDRL] to obtain a very highly resolved and highly accurate characterization of the isolator flow-field."

104. Emami's duty with regard to the IDRL was therefore to "support" the operations of Middleton, Balla, Baurle, Wilson, and Witte.

105. As a practical matter, Emami's ability to perform CJE #1 was limited by the fact that the IDRL was never fully operational during his employment.

106. Moreover, the IDRL was required to undergo global testing of all equipment to assure that it could function as a whole, prior to any research being performed.

107. The IDRL was not subject to such testing at any time prior to Emami's termination.

108. The IDRL was also required to undergo a Facility Systems Safety Analysis prior to any research being performed.

109. The IDRL was not subject to a Facility Systems Safety Analysis at any time prior to Emami's termination.

110. In his role as a Aerospace Engineer, Emami was responsible for only one of several apects/parts of the research to be performed in the IDRL.

111. Emami was not ever responsible for the IDRL's operational status.

112. To complete his work, and to fully satisfy CJE #1, Emami needed the IDRL to be operational, and thus needed Middleton and Wilson to fulfill their duties.

113. From July 2012 until his termination on April 12, 2013, Emami worked diligently in the IDRL to install sensors, configure files, set up technical parameters, and set up the computer system in the IDRL.

114. He also ran a preliminary isolator test in the IDRL, and prepared clear, concise instructions and schematics that were accepted by the technicians in the IDRL.

115. On April 12, 2013, Middleton and Wilson had not fulfilled their duties in a manner that would allow the IDRL to function properly.

## Rock's Issuance of a PIP to Emami

116. On January 18, 2013, Rock suddenly issued a memorandum to Emami, accusing him of "unacceptable performance" in regard to CJE #1.

117. Rock then issued a memorandum to Emami, outlining a Performance Improvement Plan (hereinafter, "PIP").

118. In relevant part, the PIP required Emami to do the following:

> Under the standard "Develop a quarterly report," in the format of power point charts or written text supported by figures, that communicates research results and findings, you must provide a quarterly report. The quarterly report should provide enough information to cover the first and second quarters and contain documentation of the experimental set-up, approaches and procedures; the data acquisition and processing methodology, and the analysis conducted towards the research goals and objectives.

119. In the scientific context, the PIP's requirement that Emami provide "results" was nonsensical, since the IDRL was not operational during the PIP period, and thus, no true "results" could be obtained.

120. The PIP was the first discipline Emami ever received during his career.

121. At no point prior to 2012 had Emami ever been rated as anything below "Meets Expectations" on any element of a performance review.

122. In reviewing the PIP memorandum Emami also noticed that Rock had altered the requirements of the "Needs Improvement" standard so that they were more difficult for Emami to satisfy than the requirements of the "Meets Expectations" standard.

123. In general, Emami understood that through the PIP, Rock was subjecting him to a far more difficult standard than that applied to the other NASA employees under similar circumstances.

124. Rock did not subject Middleton, Balla, Baurle, Wilson, or Witte to a PIP, despite the fact that they had not been able to complete their tasks on the IDRL in a manner that would allow research to proceed.

125. At the time that Rock issued the PIP to Emami, the tasks charged to Middleton, Balla, Baurle, Wilson, and Witte all remained in their early stages.

126. Concerned that Rock had designed the PIP in a way that would assure that Emami could not keep his employment, Emami contacted Nicole Smith in the OHCM and told her that he did not believe the PIP was issued "in good faith."

127. Emami requested that Smith meet with Rock and himself in mediation to discuss the problems presented by the PIP.

128. Emami also requested that Smith assist him in obtaining a transfer so that he would no longer have to work directly under Rock – an individual who had previously demonstrated an undue hostility and bias toward him.

129. Rock and Smith both refused to engage in mediation with Emami or to otherwise discuss the contents of the PIP.

130. Rock took exception to Emami's e-mail to Smith and chastised him for communicating with her in a manner with which he did not agree.

131. Notwithstanding his objections to the PIP, Emami worked diligently to fully comply with its requirements.

132. In accordance with the PIP, Emami submitted quarterly reports to NASA on February 15, 2013 and March 14, 2013.

133. Emami submitted his first quarterly report directly to Rock.

134. Upon finding that Rock was continuing to subject him to undue hostility, Emami submitted his second quarterly report to Smith on March 14, 2013.

135. Smith immediately forwarded Emami's quarterly report to Rock.

136. Emami's second quarterly report included five appendices and explicitly set forth Emami's work and accomplishments during the first two quarters of the 2012-2013 period.

137. An objective review of Emami's quarterly reports reveals that they contained all of the information required by the PIP, including documentation of his experimental setup, approach, and procedures, data acquisition and processing methodology, and analyses conducted toward the research goals and objectives.

138. Throughout the PIP period, Rock repeatedly added requirements that were not in the original PIP, and constantly changed the standards by which Emami would be judged.

139. Federal policy prohibits managerial employees from changing the requirements of a PIP during a PIP period, and thus, Rock's behavior was a direct violation of federal policy.

140. At one point, Rock began to harshly criticize the contents of Emami's quarterly report.

141. Smith subsequently wrote an e-mail to Rock in which she stated that his "assessment of the content of the Quarterly Report was outside of what [he] required of [Emami]" and that his "instruction to [Emami] in the PIP memo did not specify how the content would be assessed."

142. On several occasions, Emami told Rock that the PIP's requirements were unclear.

143. Rock failed to provide Emami with sufficient information to understand what, if any, shortcomings Rock perceived in Emami's quarterly reports.

144. Throughout the PIP period, Rock sharply criticized and harassed Emami.

145. At one point during the PIP period, Rock humiliated Emami by feigning that he could not understand Emami's words because his accent was too thick. Rock then forced Emami to write down his statement.

146. Rock's behavior during the PIP period served to further confirm Emami's belief that Rock was not able to evaluate his performance in an objective manner.

### Rock's Proposed Removal of Emami

147. Despite the fact that Emami had fully complied with the PIP's requirements, including the requirement to provide a quarterly report, Rock issued a Notice of Removal to Emami on April 12, 2013.

148. Upon reviewing the Notice, Emami observed that nearly all of the information therein was completely inaccurate.

149. Emami believed that NASA needed an objective view of his performance. As such, he requested permission to meet with his supervisor along with two or three scientists who could help evaluate and explain certain aspects of Emami's work that Rock appeared to misunderstand.

150. NASA denied Emami's request to present evidence from unbiased scientific experts, and instead proceeded to terminate Emami based on Rock's false representations.

151. Emami appealed Rock's decision to terminate his employment.

152. The Decision Official who reviewed Emami's case on appeal was Deputy Director Damador Ambur (hereinafter, "Ambur").

153. Ambur was new to the Directorate in 2013, having started in June 2012.

154. Ambur was not acquainted with Emami, and he therefore relied exclusively on Rock's representations of Emami's work and conduct in deciding whether to uphold his termination.

155.    Rock was able to arrange the information reviewed by Ambur in a deceptive manner.

156.    Rock also made numerous false and harmful statements to Ambur regarding Emami, knowing his statements were false.

157.    Rock told Ambur that Emami was responsible for making sure that the IDRL was operational, knowing that this assertion was entirely false.

158.    Rock withheld a "test plan" that Emami had presented to Rock as part of his quarterly reports, and told Ambur that Emami "did not have a test plan."

159.    Rock also claimed that Emami had not presented any schematics, despite the fact that Emami had provided extensive, clear, and valid schematics to him on March 13, 2013.

160.    Importantly, the test plan, research plan, schematics, and other documents Emami submitted with his quarterly reports were significantly more detailed, more accurate, and otherwise superior to those submitted by Middleton, Balla, Baurle, Wilson, or Witte during the 2012-2013 evaluation period.

161.    Rock fabricated claims that Emami was unable to maintain cooperative relations with other employees, and asserted that Emami had made "disruptive, inflammatory, accusatory, and belligerent" statements during the PIP period.

162.    Rock's statement regarding purportedly "disruptive, inflammatory" and "accusatory" communications was a direct reference to Emami's discrimination complaints.

163.    Importantly, before Ambur issued his final decision, Rock approached him to discuss "the history with Emami," including Emami's prior discrimination complaints, which are discussed in further detail below.

## Emami's Discrimination Complaints

164.   Based on his reasonable belief that Rock and others within NASA's management were biased against him because of his national origin and religion, Emami made internal complaints of discrimination.

165.   From 2008 to 2013, Emami approached Rock personally and via e-mail on numerous occasions to complain that Rock was treating him in a harsh, threatening, humiliating, and discriminatory manner.

166.   Emami lodged informal discrimination complaints with NASA's EEO Office in 2009 and 2010 after Rock questioned his patriotism and stated that "you people are combative."

167.   On June 29, 2010, Emami sent an e-mail to Associate Director Cynthia Lee (hereinafter, "Lee"), stating that he had been arbitrarily denied promotions, advancement, transfers, and details.

168.   Lee ignored Emami's complaint.

169.   Emami lodged other informal complaints with the EEO Office in 2012, after Rock altered his Plan so that he would be subject to a far more difficult standard than that applied to other employees, including Middleton, Balla, Baurle, Wilson, and Witte.

170.   Emami issued a final complaint against Rock with the EEO Office in January 2013.

171.   In January 2013, the EEO Office issued a Notice of Of Right to File a Formal Complaint to Emami, indicating that the EEO Office had conducted an investigation into Emami's complaints and discussed the complaints with Rock.

172.   At the time he issued the PIP to Emami, Rock was aware that Emami had alleged that Rock discriminated against him.

173. In fact, during his testimony to the MSPB, Rock explained that at the time he made the decision to terminate Emami, he believed that Emami was discussing his situation with the EEO Office "regularly."

174. Upon receiving Ambur's June 27, 2013 decision, Emami appealed to the MSPB. He included in his appeal his claims for discrimination and retaliation in violation of Title VII.

### Emami's Termination

175. Ambur upheld Emami's termination on June 27, 2013.

176. Ambur based his decision entirely on Rock's misrepresentations regarding Emami's job performance, abilities, personality, and discrimination complaints.

177. Neither Ambur nor any other person within NASA's management conducted an independent investigation into the facts and circumstances surrounding Rock's decision to terminate Emami.

178. At the time Emami was terminated, the IDRL was still not operational.

179. To Emami's knowledge, no other NASA employee was terminated in 2013 based on the non-operational status of the IDRL.

180. At the time of Emami's termination, Middleton, Balla, Baurle, Wilson, and Witte had not completed their work on the IDRL. Emami nevertheless took all possible steps to comply with the requirements of CJE #1.

181. At the time of Emami's termination, the IDRL was still not operational in a manner that would allow valid research activities to proceed.

182. After terminating Emami, NASA replaced Emami with an employee who was not from Iran and who was not Muslim.

183. NASA's discriminatory and retaliatory decisions to subject Emami to a PIP and terminate his employment, and Rock's intentional conduct precipitating the PIP and termination, have caused Emami to suffer financial, economic, professional, social, mental, emotional, and physical harm. This harm is ongoing.

## COUNT I:

### NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII

### Against NASA

184. Emami hereby incorporates each of the above paragraphs as though fully set forth herein.

185. At all times relevant to this Complaint, Emami was an employee of NASA.

186. Emami belongs to a protected category under Title VII because he is an Iranian-American.

187. At all times during his employment with NASA, Emami performed his job in accordance with NASA's legitimate expectations, as evidenced by his performance evaluations, raises, and the lack of any discipline from 2002 to 2013.

188. In every evaluation period from 2002 until 2012, NASA rated Emami as "Meets or Exceeds Expectations" or "Fully Successful."

189. Emami was consistently lauded for his creativity, innovation, collaborative efforts and valuable contributions to NASA.

190. As described in detail above, Emami was highly qualified for his position as an Aerospace Engineer.

191. Rock and others at NASA demonstrated a discriminatory animus against Emami because of his accent, which they labeled as "a communication issue."

192.     Rock, and thereby NASA, further demonstrated a discriminatory animus against Emami because of his nationality when Rock made statements questioning Emami's patriotism, and labeling Iranian-Americans as "combative."

193.     The discriminatory animus of Rock and others at NASA deprived Emami of several opportunities for professional growth and development.

194.     Rock took adverse action against Emami on January 18, 2013 when he issued him an unwarranted PIP.

195.     Rock took further adverse action against Emami on April 12, 2013 when he issued him a Notice of Proposed Removal, effectively terminating his employment.

196.     Finally, NASA took adverse action against Emami by upholding his termination on June 27, 2013.

197.     Emami's Iranian national origin played a motivating role in, or contributed to, NASA's decision to terminate his employment.

198.     At all times relevant to this Complaint, Middleton, Balla, Baurle, Wilson, and Witte were similarly situated to Emami.

199.     Middleton, Balla, Baurle, Wilson, and Witte were all treated substantially better than Emami by NASA.

200.     Neither Middleton, Balla, Baurle, Wilson, or Witte was subject to a PIP or terminated, despite their performance issues with regard to the IDRL.

201.     At all times relevant to this Complaint, Emami's job performance was substantially similar to, or even superior to, that of Middleton, Balla, Baurle, Wilson, and Witte.

202.     Middleton, Balla, Baurle, Wilson, and Witte are all non-Iranian.

203.    NASA's stated reason for terminating Emami, that Emami supposedly demonstrated "unsatisfactory performance," was a pretext to conceal Rock's true, discriminatory intent.

204.    NASA failed to conduct an independent investigation into the facts and circumstances surrounding Rock's proposal to terminate Emami, and instead rubber-stamped Rock's unlawful conduct when, on June 27, 2013, Ambur upheld Emami's termination.

205.    After Emami's termination, his position was filled by an applicant who was not an Iranian-American.

206.    Through Rock and others, NASA intentionally discriminated against Emami in violation of Title VII of the Civil Rights Act of 1964, as amended, by terminating him because of his Iranian national origin.

207.    NASA's discriminatory conduct has caused Emami to suffer financially, economically, professionally, socially, mentally, emotionally, and physically. This harm is ongoing.

208.    Because NASA violated Title VII by terminating Emami's employment because of his national origin, Emami is entitled to compensation for the harm he has suffered.

## COUNT II:

### RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII

### Against NASA

209.    Emami hereby incorporates each of the above paragraphs as though fully set forth herein.

210.    At all times relevant to this Complaint, Emami was an employee of NASA.

211.    Emami belongs to the Muslim faith, Islam.

212.    As a Muslim, Emami is subject to the protections of Title VII.

213. In every evaluation period from 2002 until 2012, NASA rated Emami as "Meets or Exceeds Expectations" or "Fully Successful."

214. Emami was consistently lauded for his creativity, innovation, collaborative efforts and valuable contributions to NASA.

215. As described in detail above, Emami was highly qualified for his position as an Aerospace Engineer.

216. At all times during Emami's employment, Rock and the other management officials who took adverse actions against Emami were aware of his Muslim faith.

217. Rock took adverse action against Emami on January 18, 2013 when he issued him an unwarranted PIP, and took further adverse action against Emami on April 12, 2013 when he issued him a Notice of Proposed Removal, effectively terminating his employment.

218. NASA took additional adverse action against Emami by upholding his termination on June 27, 2013.

219. Emami's religion played a motivating role in, or contributed to, NASA's decision to terminate Emami's employment.

220. At all times relevant to this Complaint, Middleton, Balla, Baurle, Wilson, and Witte were similarly situated to Emami.

221. Middleton, Balla, Baurle, Wilson, and Witte were all treated substantially better than Emami by NASA.

222. Neither Middleton, Balla, Baurle, Wilson, or Witte was subject to a PIP or terminated, despite their performance issues with regard to the IDRL.

223. At all times relevant to this Complaint, Emami's job performance was substantially similar to, or even superior to, that of Middleton, Balla, Baurle, Wilson, and Witte.

224.    Middleton, Balla, Baurle, Wilson, and Witte are all non-Muslims.

225.    NASA's stated reason for terminating Emami, that Emami supposedly demonstrated "unsatisfactory performance," was a pretext to conceal Rock's true, discriminatory intent.

226.    NASA failed to conduct an independent investigation into the facts and circumstances surrounding Rock's proposal to terminate Emami, and instead rubber-stamped Rock's unlawful conduct when, on June 27, 2013, Ambur upheld Emami's termination.

227.    After Emami's termination, his position was filled by an applicant who was not Muslim.

228.    Through Rock and others, NASA intentionally discriminated against Emami in violation of Title VII of the Civil Rights Act of 1964, as amended, by terminating him because of his religion.

229.    NASA's discriminatory conduct has caused Emami to suffer financially, economically, professionally, socially, mentally, emotionally, and physically. This harm is ongoing.

230.    Because NASA violated Title VII by terminating Emami's employment because of his religion, Emami is entitled to compensation for the harm he has suffered.

## COUNT III:

### RETALIATION IN VIOLATION OF TITLE VII

### Against NASA

231.    Emami hereby incorporates each of the above paragraphs as though fully set forth herein.

232.    At all times relevant to this complaint, Emami was an employee of NASA.

233.    Emami is an Iranian-American who practices Islam, and as such, he is subject to the protections of Title VII.

234. During his employment with NASA, Emami opposed practices he reasonably believed to be unlawful under Title VII.

235. Emami made complaints regarding the discrimination he was experiencing to Rock, Rock's supervisors, Ferlemann, Smith, OHCM, and NASA's EEO Office.

236. Emami lodged informal complaints through NASA's EEO Office and sought to assist that Office in conducting an investigation under Title VII.

237. Emami's communications with these individuals and offices constitute "protected activity" as defined by Title VII.

238. At all times relevant to this Complaint, Rock and NASA were fully aware of Emami's protected activity.

239. Rock and NASA took adverse action against Emami on January 18, 2013 by issuing him a PIP that was not warranted.

240. Rock and NASA took further adverse action against Emami on April 12, 2013 through a Notice of Proposed Removal.

241. Finally, NASA took adverse action against Emami by upholding his termination on June 27, 2013.

242. But for Emami's participation in protected activity, Rock and NASA would not have taken these actions against Emami.

243. At all times relevant to this Complaint, Middleton, Balla, Baurle, Wilson, and Witte were all similarly situated to Emami, but were treated substantially better than Emami. Neither Middleton, Balla, Baurle, Wilson, nor Witte was ever subject to a PIP or termination.

244. At all times relevant to this Complaint, Emami's job performance was substantially similar or superior to that of Middleton, Balla, Baurle, Wilson, and Witte.

245.    Neither Middleton, Balla, Baurle, Wilson, or Witte engaged in protected activity, as did Emami.

246.    Rock's stated reason for terminating Emami, that Emami demonstrated "unsatisfactory performance," was and is a pretext to conceal his true, retaliatory intent.

247.    Rock's discussion with Ambur regarding the "history with Emami" was a proximate cause of Emami's termination.

248.    NASA failed to conduct an independent investigation into the facts and circumstances surrounding Rock's proposal to terminate Emami, and instead rubber-stamped Rock's unlawful conduct when, on June 27, 2013, Ambur upheld Emami's termination.

249.    Through Rock and others, NASA intentionally retaliated against Emami in violation of Title VII of the Civil Rights Act of 1964, as amended, by terminating him because he engaged in protected activity.

250.    NASA's conduct has caused Emami to suffer financially, economically, professionally, socially, mentally, emotionally, and physically. This harm is ongoing.

251.    Because NASA violated Title VII by terminating Emami's employment because he engaged in protected activity, Emami is entitled to compensation for the harm he has suffered.

## COUNT IV:

### TORTIOUS INTERFERENCE WITH CONTRACT

### Against Rock Individually

252.    Emami hereby incorporates each of the above paragraphs as though fully set forth herein.

253.    From October 7, 2002 to April 12, 2013, a valid contractual relationship existed between Emami and NASA.

254.    At all times relevant to this Complaint, Rock was aware of the valid contractual relationship that existed between Emami and NASA.

255.    Absent Rock's interference with Emami's contract, Emami was reasonably certain to remain employed by NASA beyond April 12, 2013, as demonstrated by his qualifications, accomplishments, performance ratings, and his cooperative relationships with other employees at NASA.

256.    Rock intentionally and maliciously interfered with Emami's contractual rights by publishing statements about Emami that were false and harmful to Emami's professional interests.

257.    Rock represented to NASA that Emami did not have an "approved IDP," even though Rock, himself, approved Emami's IDP.

258.    Rock told Ambur and others at NASA that Emami did not submit a quarterly report when, in fact, Emami submitted two quarterly reports containing all of the  information required by the PIP, including documentation of his experimental setup, approach, and procedures, data acquisition and processing methodology, and analyses conducted toward the research goals and objectives.

259.    Emami submitted his first quarterly report directly to Rock. Upon finding that Rock was continuing to subject him to undue hostility, Emami submitted his second quarterly report to Smith on March 14, 2013.

260.    Smith immediately forwarded Emami's quarterly report, which included five appendices explicitly setting forth Emami's work during the first two quarters of the 2012-2013 period, to Rock.

261.    Rock therefore knew that his statements regarding Emami's quarterly reports were false.

262. Rock told Ambur and others at NASA that Emami did not satisfy the requirements of the PIP, knowing that Emami had, in fact satisfied the requirements of the PIP.

263. Rock repeatedly demonstrated his malice toward Emami by changing the requirements of the PIP after it was issued.

264. Rock told Ambur and others at NASA that Emami was responsible for making sure that the IDRL was operational, even though he knew that making the IDRL operational was never Emami's responsibility.

265. Rock told Ambur and others at NASA that Emami "did not have a test plan," even though Emami had provided his test plan to Smith, who provided it to Rock on March 13, 2013.

266. Rock fabricated allegations that Emami was unable to maintain cooperative relations with other employees, and claimed that Emami made "disruptive, inflammatory, accusatory, and belligerent" statements during the PIP period.

267. These allegations were completely false and themselves inflammatory.

268. Throughout 2012 and 2013, Rock repeatedly made false statements to Ambur and others at NASA regarding Emami's job performance, qualifications, knowledge, and expertise.

269. Moreover, Emami has reason to believe that Rock made false, disparaging, malicious, and defamatory statements about him to Ambur when the two discussed "the history with Emami," prior to Ambur's final decision to uphold Emami's termination.

270. Rock made the false statements described in the paragraphs above for the purpose of depriving Emami of his employment with NASA.

271. Rock's conduct toward Emami was independently tortious because it constituted defamation under Virginia common law.

272. By defaming Emami, Rock engaged in "improper methods," as defined by Virginia common law, to deprive Emami of his employment.

273. Rock knew that his defamatory statements were false and harmful to Emami, and as such, he acted with malicious intent.

274. Rock's intentional and tortious interference with Emami's contract caused Emami to be terminated, and thus to suffer severe economic harm, for which Rock is liable.


## COUNT V:

### TORTIOUS INTERFERENCE WITH CONTRACT EXPECTANCY

### Against Rock Individually

275. Emami hereby incorporates each of the above paragraphs as though fully set forth herein.

276. From October 7, 2002 to April 12, 2013, a valid contractual relationship existed between Emami and NASA.

277. At all times relevant to this Complaint, Emami had a reasonable expectation of continued employment with NASA.

278. At all times relevant to this Complaint, Rock was aware of the valid contractual relationship that existed between Emami and NASA, and of Emami's reasonable expectation of continued employment with NASA.

279. Absent Rock's interference with Emami's contract, Emami was reasonably certain to remain employed by NASA beyond April 12, 2013, as demonstrated by his qualifications, accomplishments, performance ratings, and his cooperative relationships with other employees at NASA.

280. Rock intentionally and maliciously interfered with Emami's expectation of continued employment with NASA by publishing statements about Emami that were false and harmful to Emami's professional interests.

281. Rock represented to NASA that Emami did not have an "approved IDP," even though Rock, himself, approved Emami's IDP.

282. Rock told Ambur and others at NASA that Emami did not submit a quarterly report when, in fact, Emami submitted two quarterly reports containing all of the information required by the PIP, including documentation of his experimental setup, approach, and procedures, data acquisition and processing methodology, and analyses conducted toward the research goals and objectives.

283. Emami submitted his first quarterly report directly to Rock.

284. Upon finding that Rock was continuing to subject him to undue hostility, Emami submitted his second quarterly report to Smith on March 14, 2013.

285. Smith immediately forwarded Emami's quarterly report, which included five appendices explicitly setting forth Emami's work during the first two quarters of the 2012-2013 period, to Rock.

286. Rock therefore knew that his statements regarding Emami's quarterly reports were false.

287. Rock told Ambur and others at NASA that Emami did not satisfy the requirements of the PIP, knowing that Emami had, in fact, satisfied the requirements of the PIP.

288. Rock repeatedly demonstrated his malice toward Emami by changing the requirements of the PIP after it was issued.

289. Rock told Ambur and others at NASA that Emami was responsible for making sure that the IDRL was operational, even though he knew that making the IDRL operational was never Emami's responsibility.

290. Rock told Ambur and others at NASA that Emami did not have a "test plan," even though Emami had provided his test plan to Smith (who provided it to Rock) on March 13, 2013.

291. Rock fabricated allegations that Emami was unable to maintain cooperative relations with other employees, and claimed that Emami made "disruptive, inflammatory, accusatory, and belligerent" statements during the PIP period.

292. These allegations were completely false and themselves inflammatory.

293. Throughout 2012 and 2013, Rock repeatedly made false statements to Ambur and others at NASA regarding Emami's job performance, qualifications, knowledge, and expertise.

294. Moreover, Emami has reason to believe that Rock made false, disparaging, malicious, and defamatory statements about him to Ambur when the two discussed "the history with Emami," prior to Ambur's final decision to uphold Emami's termination.

295. Rock made the false statements described in the paragraphs above for the purpose of depriving Emami of future employment with NASA.

296. Rock's conduct toward Emami was independently tortious because it constituted defamation under Virginia common law.

297. By defaming Emami, Rock engaged in "improper methods," as defined by Virginia common law, to deprive Emami of his employment.

298. Rock knew that his defamatory statements were false and harmful to Emami, and as such, he acted with malicious intent.

299.   Rock's intentional and tortious interference with Emami's contract expectancy caused Emami to be terminated, and thus to suffer severe economic harm, for which Rock is liable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that this Court enter judgment against the Defendants and in addition that this Court award the Plaintiff:

A.  Against NASA:

1.  A declaratory judgment finding that acts and practices complained of herein constitute violations of Title VII;

2.  An injunction ordering the Defendant to reinstate the Plaintiff to his former position or to a substantially similar position; or in the alternative, front pay in an amount to be determined at trial;

3.  All back pay, earnings, and benefits the Plaintiff would have received but for NASA's discrimination and retaliation;

4.  Compensatory damages in the amount of Three Hundred Thousand Dollars ($300,000.00) for future economic and non-economic losses, emotional distress, pain and suffering, humiliation, mental anguish, impairment of quality of life, and consequential losses;

5.  Reasonable attorneys' fees;

6.  The costs of this action;

B.  Against Rock:

1.  Actual and compensatory damages, including, but not limited to, the present value of the income that the Plaintiff lost from April 12, 2013

to the date that judgment is entered, in an amount to be determined at trial;

2. Punitive damages in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00) to account for the malicious, willful, wanton, and reckless nature of the Defendant's conduct toward the Plaintiff; and

C. Such other and further relief as the Court may find to be proper and just.

## JURY DEMAND

A TRIAL BY JURY IS DEMANDED.

RESPECTFULLY SUBMITTED,
SAIED EMAMI
By Counsel:

Lisa K. Lawrence (VSB No. 34597)
Barbara A. Queen (VSB No. 47314)
Adam M. Harrison (VSB No. 79345)
LAWRENCE & ASSOCIATES
701 East Franklin Street, Suite 800
P.O. Box 495
Richmond, Virginia 23219
Tel.: (804) 643-9343
Fax.: (804) 643-9368
E-mail: aharrison@lawrencelawyers.com