**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| **SAIED EMAMI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.: 2:15-cv-00034** |
| ) | |
| **CHARLES F. BOLDEN, JR.,** ) | |
| **IN HIS OFFICIAL CAPACITY AS** ) | |
| **ADMINISTRATOR,** ) | |
| **NATIONAL AERONAUTICS AND** ) | |
| **SPACE ADMINISTRATION** ) | |
| ) | |
| **and** ) | |
| ) | |
| **KENNETH E. ROCK,** ) | |
| **Individually,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANT NASA'S MOTION TO DISMISS**

COMES NOW the Plaintiff, Saied Emami, by counsel, and pursuant to Rule 12 of the

Federal Rules of Civil Procedure, and in opposition to the motion to dismiss filed as part of the

"Motion to Dismiss or, in the Alternative, for Summary Judgment" of Defendant Charles F.

Bolden, Jr., in his official capacity as Administrator of the National Aeronautics and Space

Administration, states as follows:

## I. INTRODUCTION

On January 23, 2015, the Plaintiff Saied Emami, Ph.D ("Emami") timely filed a

Complaint against Defendant Charles F. Bolden, Jr., in his official capacity as Administrator of

the National Aeronautics and Space Administration ("NASA") and Kenneth Rock, individually

("Rock"). In his Complaint, Emami alleged that NASA discriminated against him in his employment because of his national origin (Iranian) and his religion (Islam) and retaliated against him for engaging in protected activity, all in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"). He also alleged that Rock tortiously interfered with his employment in violation of Virginia law. On April 1, 2015, Emami filed an Amended Complaint, clarifying his claims against NASA and Rock.

On June 15, 2015, NASA responded to the Amended Complaint by filing a document styled "Motion to Dismiss or, in the Alternative, for Summary Judgment" ("NASA Motion") along with a "Memorandum in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment" ("NASA Memorandum"). In its Motion and Memorandum, NASA moved the Court to dismiss the Amended Complaint on two bases: (a) that the Amended Complaint fails to state a claim upon which relief may be granted; and (b) that the Court lacks subject matter jurisdiction over Emami's claims.[1]

NASA's Motion and Memorandum also ask the Court for summary judgment. As a practical matter, NASA's Motion seeks two distinct remedies and thus constitutes two separate motions. This Memorandum in Opposition to Defendant NASA's Motion to Dismiss ("Opposition") relates only to those aspects of NASA's Motion that properly constitute a motion to dismiss. Emami has responded to the aspects of NASA's Motion and Memorandum that seek

---

[1] In its Motion, NASA informally asks the Court to dismiss Counts IV and V, which have been brought against Rock in his individual capacity. NASA Memorandum at 1, 28-29. NASA's counsel does not represent Rock, who has not made an appearance in this case, and NASA has no stake in the outcome of Counts IV and V. Arizonans for Official English v. Arizona, 520 U.S. 43, 64 (1997) ("Standing to sue or defend is an aspect of the case or controversy requirement") (citing Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville, 508 U.S. 656, 663-64 (1993)). To qualify as a party with standing to litigate, a person must show, first and foremost, "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent." Arizonans for Official English, 520 U.S. at 64. (citations omitted). An interest shared generally with the public at large in the proper application of the Constitution and laws will not do. Id. at 64-65. Standing to sue or defend "demands that the litigant possess a direct stake in the outcome." Id. Because NASA lacks standing to file a defense to Counts IV and V, its request is improper and should not be granted.

to obtain summary judgment in a separate filing styled "Memorandum in Opposition to Defendant NASA's Motion for Summary Judgment," which has been filed contemporaneously with this Opposition.

Because Emami's Amended Complaint states plausible claims of discrimination and retaliation in violation of Title VII against NASA, NASA's motion to dismiss Counts I, II and III of the Amended Complaint should be denied.

## II. SUMMARY OF FACTS

Emami is a 58-year-old Iranian-American Muslim who worked for NASA at the Langley Air Force Base in Hampton, Virginia from October 7, 2002 to April 12, 2013. Am. Compl. ¶¶ 26-29, 39. Emami was employed as an Aerospace Engineer in the Hypersonic Air-breathing Propulsion Branch ("Branch"), Research Directorate ("Directorate"). Am. Compl. ¶ 29. Emami's employment was terminated by Rock, a supervisor who had previously and repeatedly demonstrated hostility toward Emami that he did not exhibit toward other employees at the Branch. Am. Compl. ¶ 39, 65-77.

Throughout his employment, Emami performed his job well, and as a result, he received positive employment reviews during each of the first ten years of his employment. Am. Compl. ¶¶ 43-64. These reviews included ratings of "Fully Successful" or higher on every criterion on every one of his evaluations from 2002 until 2012.[2] Am. Compl. ¶¶ 43-59. Additionally, during each evaluation period from 2002 to 2012, Emami received a "step increase" in his compensation from NASA based on his excellent ratings and satisfaction of NASA's

---

[2] NASA changed its rating system during the 2007-2008 evaluation period, so that the "Meets or Exceeds Expectations" level became the "Fully Successful" level. In every evaluation period from 2002 until 2012, NASA rated Emami as either "Meets or Exceeds Expectations" or "Fully Successful" (the equivalent of a "Meets or Exceeds Expectations" rating after NASA changed its rating system in 2008).

expectations. Am. Compl. ¶¶ 60. From the date of his hire until January 2013, Emami was never subject to any kind of disciplinary action. Am. Compl. ¶ 42.

For each evaluation period from 2002 to 2012, Emami's reviews reflected that NASA believed that he collaborated well with other employees and maintained cooperative and respectful working relationships with his coworkers. Am. Compl. ¶ 58. NASA specifically noted in Emami's reviews that: "[o]ral and written communications are open and honest, yet aware of and sensitive to individual and cultural differences;" "[i]nformation is usually accurate and effectively presented;" "[w]ritten materials generally follow NASA's prescribed standards and style and are infrequently returned for substantial revision;" and "[o]ral communications are generally courteous (e.g., shows respect, listens well, and responds appropriately)." Am. Compl. ¶ 59.

During his eleven years of employment with NASA, Emami was never aware of any criticism regarding his manner of communication, except from Rock, the Branch Head who was appointed in 2005. Am. Compl. ¶ 63.

From the date of his appointment until he proposed Emami's termination in April 2013, Rock consistently demonstrated a discriminatory animus toward Emami. Am. Compl. ¶¶ 65-77, 82, 88-89, 94-96, 101-106, 114-117, 118-121, 124, 126-127, 132, 140-149, 158-156, 158-166, 182-185. For example, during a discussion with Emami on April 23, 2009, Rock became angry with Emami and asked, "Don't you like this country?" Am. Compl. ¶¶ 66-67. Emami was highly offended by this comment, which he reasonably interpreted as an indication that Rock had prejudged him as lacking in devotion to the United States simply because he is a Muslim from Iran. Am. Compl. ¶ 68. Similarly, in 2011, Rock referred to Muslims and Iranians as "you

people" and in 2013, Rock mocked Emami by feigning that he could not understand Emami's words because his accent was too thick. Am. Compl. ¶¶ 69, 148.

From 2009 to 2012, Emami repeatedly complained to NASA about Rock's discriminatory conduct. Am. Compl. ¶¶ 167-177. He directed these complaints to Rock himself, to NASA's Office of Equal Employment Opportunity ("EEO"), to NASA's Office of Human Capital Management ("OHCM"), and to the Deputy Director of the Directorate. Am. Compl. ¶¶ 40, 71-72, 128, 168-170, 172-174. During his conversations with these offices and officials, Emami informed NASA that he believed Rock was biased against him because of his national origin and his religion. Am. Compl. ¶¶ 40, 71-72.

In January 2012, Emami lodged another complaint against Rock and obtained a Notice of Right to File a Formal Complaint from the EEO Office. Am. Compl. ¶¶ 173-174.

Despite Emami's complaints to EEO, OHCM, and the Deputy Director, no action was taken to address Rock's animosity toward Emami, and Rock continued to treat Emami in a hostile manner. Am. Compl. ¶ 73. In March 2012, Rock suddenly and inexplicably claimed that Emami did not have an "approved" Individual Development Plan, even though Rock himself had previously approved Emami's IDP. Am. Compl. ¶ 74. Rock also cut the funding for several of Emami's projects and travel, thus depriving him of vital professional opportunities that were provided to other, non-Muslim and non-Iranian employees. Am. Compl. ¶¶ 75-76. Additionally, Rock refused to meet with Emami to discuss the details of vague assignments that he had given to Emami. Am. Compl. ¶ 77. Rock also denied Emami the opportunity to obtain training that would allow him to transfer out of the Branch. Am. Compl. ¶¶ 82, 87-89.

During his employment, Emami became aware of an institutional bias against Iranian-Americans and Muslims within NASA itself. Am. Compl. ¶¶ 79-81. This bias was demonstrated

by the fact that NASA repeatedly denied Emami opportunities to obtain promotions, transfers, and details, which opportunities were then awarded to less qualified employees who were not Iranian-American or Muslims. Am. Compl. ¶¶ 79-90. Rock and other NASA employees told Emami that he was "not a good fit" for the promotions, transfers, or details for which he applied because he "speak[s] with an accent" and has "communication problems." Am. Compl. ¶ 82. Similar comments regarding Emami were made to the individuals responsible for awarding the promotions, transfers, and details. Am. Compl. ¶ 83.

During the 2012-2013 performance year, the majority of Emami's work centered around a Test Apparatus in the Branch's Isolator Dynamics Research Lab ("IDRL"). Am. Compl. ¶¶ 105-106. The IDRL was never fully operational during Emami's employment with NASA, and thus Emami was not able to obtain valid test results during the 2012-2013 period. Am. Compl. ¶¶ 107, 112. Nevertheless, Emami worked diligently in the IDRL during that period, obtaining preliminary results of a set of analyzed data, installing sensors, configuring files, setting up technical parameters, preparing clear and concise instructions and schematics for the technicians, and setting up the IDRL's computer system. Am. Compl. ¶¶ 115-116. He also performed vital tests, including a Factory Acceptance Test and a preliminary isolator test. Am. Compl. ¶¶ 108, 116.

An objective review of Emami's performance during the 2012-2013 performance year would unequivocally establish that his actions met NASA's legitimate expectations. Am. Compl. ¶¶ 108, 115-116, 133-134, 140.

Unfortunately for Emami, after years of being subject to EEO complaints, Rock proved unwilling to review Emami's performance in an objective manner, as demonstrated by the 2012-2013 Performance Plan ("Plan") that Rock established for Emami. Am. Compl. ¶¶ 94-96. The

Plan essentially set Emami up to fail, and thus suffer an unwarranted termination, by holding Emami responsible for the functionality of the IDRL and demanding that Emami produce and report scientific "results and findings." Am. Compl. ¶¶ 94-95. As Rock was aware, both of these objectives were practically unobtainable during the 2012-2013 year because the IDRL was not operational during that time. Am. Compl. ¶¶ 98-117.

Rock took a second step toward terminating Emami by issuing him a Performance Improvement Plan ("PIP") on January 18, 2013. Am. Compl. ¶¶ 118-120. In the PIP, Rock accused Emami of "unacceptable performance," claiming that he had failed to submit weekly and quarterly reports that sufficiently detailed his "results and findings" in the IDRL. Am. Compl. ¶¶ 118, 120. As such, the PIP required Emami to submit "weekly reports" and a "quarterly report" to NASA. Am. Compl. ¶ 120.

In the PIP, Rock altered the requirements of the "Needs Improvement" standard so that they were more difficult for Emami to satisfy than the requirements of the "Meets Expectations" standard. Am. Compl. ¶ 124. Throughout the PIP period, Rock repeatedly added requirements to the PIP and changed the standards by which Emami would be judged, despite the fact that Federal policy prohibits managerial employees from changing such requirements during a PIP period. Am. Compl. ¶¶ 141-42. At one point during the PIP period, Nicole Smith ("Smith") of the OHCM wrote an e-mail to Rock in which she stated that his "assessment of the content of the Quarterly Report was outside of what [he] required of [Emami]" and that his "instruction to [Emami] in the PIP memo did not specify how the content would be assessed." Am. Compl. ¶ 144. Rock nevertheless persisted in his inequitable conduct toward Emami. Am. Compl. ¶ 150.

Concerned that Rock had designed the PIP in a way that would assure that Emami could not keep his employment, Emami contacted Smith and told her that he did not believe the PIP

was issued "in good faith." Am. Compl. ¶ 128. Emami requested that Smith meet with Rock and himself in mediation so that Emami could explain the situation and address the problems he was having with Rock. Am. Compl. ¶ 129. Rock took exception to Emami's e-mail to Smith and chastised him for communicating with Smith in a manner with which he did not agree. Am. Compl. ¶ 132. Both Smith and Rock refused to meet with Emami in mediation. Am. Compl. ¶¶ 131-32.

At the time he issued the PIP to Emami, Rock was aware that Emami had alleged that Rock discriminated against him. Am. Compl. ¶ 175. In fact, during his testimony to the MSPB, Rock explained that at the time he made the decision to terminate Emami, he believed that Emami was discussing his situation with the EEO Office "regularly." Am. Compl. ¶ 176. Prior to terminating Emami, Rock repeatedly accused him of engaging in "disruptive, inflammatory," and "accusatory" communications (a clear reference to his EEO complaints). Am. Compl. ¶¶ 164-65. Importantly, before the Deciding Official could make his final decision regarding Emami's termination, Rock privately approached that Official to tell him about Emami's prior EEO complaints. Am. Compl. ¶ 166.

Despite his concerns regarding the PIP, Emami worked diligently to fully comply with its requirements. Am. Compl. ¶¶ 133-34. In accordance with the PIP, Emami submitted weekly reports to Rock during the PIP period and quarterly reports to NASA on February 15, 2013 and February 28, 2013. Am. Compl. ¶¶ 133-140. The quarterly reports included five appendices and explicitly set forth Emami's work and accomplishments during the first two quarters of the 2012-2013 period, as required by the PIP. Am. Compl. ¶ 138. On March 8, 2013, Emami provided additional information to Rock in the form of charts and graphs that displayed the preliminary results of a set of analyzed data from the IDRL. Am. Compl. ¶ 139. As with Emami's

performance generally, an objective review of Emami's quarterly reports reveals that they contained all of the information required by the PIP, including documentation of his experimental setup, approach, and procedures, data acquisition and processing methodology, and analyses conducted toward the research goals and objectives. Am. Compl. ¶ 140.

Despite the fact that Emami had fully complied with the PIP, including the requirement to provide a quarterly report, Rock issued a Notice of Removal ("Notice") to Emami on April 12, 2013, claiming that he failed to submit quarterly reports. Am. Compl. ¶ 150. Nearly all of the information in the Notice was inaccurate. Am. Compl. ¶ 151. Emami believed that NASA needed an objective view of his performance. Am. Compl. ¶ 152. As such, he requested permission to meet with Rock, along with two or three scientists who could help evaluate and explain certain aspects of Emami's work, all of which Rock appeared to misunderstand. Am. Compl. ¶¶ 152-53.

NASA denied Emami's request to obtain an objective review from scientific experts and instead proceeded to terminate Emami based on the false representations made by Rock. Am. Compl. ¶ 153.

The Deciding Official who reviewed Rock's Notice was Deputy Director Damador Ambur ("Ambur") – an individual who was not acquainted with Emami or his work. Am. Compl. ¶¶ 155-57. Rock made numerous false representations to Ambur, claiming that Emami was responsible for the IDRL's functionality, that Emami had not presented a "test plan" or schematics with his quarterly reports, and that Emami was unable to maintain cooperative relations with other employees. Am. Compl. ¶¶ 158-62. Rock made each of these representations knowing that they were false and harmful to Emami. Am. Compl. ¶¶ 159-62.

Notably, various engineers and researchers at the Branch were engaged in work that was substantially similar to that of Emami. Am. Compl. ¶ 100-01, 112. These engineers and researchers included: Research Project Lead Troy Middleton ("Middleton"); Principal Investigator for Laser-Based Measurements Jeff Balla ("Balla"); Principal Investigator for CFD Modeling Rob Baurle ("Baurle"); Technical Lead for Systems Integration Lloyd Wilson ("Wilson"); Lead for Experimental Techniques Dave Witte ("Witte"); Stan Mason ("Mason"); Jose Vega ("Vega"); and Paul Bagby ("Bagby"). Am. Compl. ¶¶ 100-01, 112, 114, 117. None of these NASA employees were born in Iran or practiced the religion of Islam. Am. Compl. ¶¶ 103-04. At all times during his employment, Emami's job performance was equal or superior to that of each of these employees. Nevertheless, Emami was subjected to a PIP and terminated under circumstances where these other researchers and engineers were not subject to such discipline. Am. Compl. ¶¶ 126, 182-183.

NASA's discriminatory and retaliatory actions and Rock's intentional interference with his employment relationship have caused Emami to suffer financial, economic, professional, social, mental, emotional, and physical harm, which harm is ongoing. Am. Compl. ¶ 186.

### III.    JURISDICTIONAL FACTS

NASA is a federal agency within the United States government that is subject to this Court's jurisdiction under 42 U.S.C. § 2000e-16(a). Am. Compl. ¶ 17; See PEX 1: NASA Info., available at http://www.nasa.gov/about/index.html. At all times relevant to this Complaint, NASA was Emami's employer. Am. Compl. ¶ 15. Charles F. Bolden, Jr. ("Bolden") is the head of NASA, and thus, a properly named defendant in this action. Am. Compl. ¶ 16.

Emami's claims against NASA arise under the laws of the United States of America, namely, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-16(a), 2000e-16(c), and 2000e-5.

Emami timely appealed his termination to the Merit Systems Protection Board. PEX 2: MSPB Decision at 1. He then appealed the Initial Decision of the MSPB by filing this action within 30 calendar days of December 25, 2014 – the date on which the MSPB's Decision became final – in accordance with the instructions he received from the MSPB. PEX 2: MSPB Decision at 33 (citing 5 U.S.C. § 7703(b)(2)).

## IV.   STANDARDS OF REVIEW

### A. NASA's MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). Rule 8(a)(2) of the Federal Rules of Civil Procedure, which governs federal complaints, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendants fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). In ruling on a 12(b)(6) motion to dismiss, the court "must assume that the allegations of the complaint are true and construe them in the light most favorable to the plaintiff." Martin, 980 F.2d at 952.

To survive a 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter which, when accepted as true, "state[s] a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

570 (2007)). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference" that "there is more than a mere possibility that the defendant is liable for the misconduct alleged." Iqbal 556 U.S. at 678. "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Gibson, 355 U.S. at 45-46.

"Although the Supreme Court has made clear that the factual allegations in a complaint must make entitlement to relief plausible and not merely possible, what Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations." Bala v. Virginia Dep't of Conservation & Rec., 532 F. App'x. 332, 334 (4th Cir. 2013) (citing McLean v. United States, 566 F.3d 391, 399 (4th Cir. 2009)).

### B. NASA's 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure should be granted if, after engaging in any necessary fact-finding, the district court determines that the movant is entitled to judgment as a matter of law. Demetres v. East West Constr., Inc., 776 F.3d 271, 272 (4th Cir. 2015) (citing Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006)). The burden of proving the asserted basis for jurisdiction falls on the plaintiff. Demetres, 776 F.3d at 272.

"In determining whether jurisdiction exists, the district court is to regard the allegations in the complaint as 'mere evidence' and may consider evidence outside the pleadings without converting the motion into one for summary judgment." Melendez v. Sebelius, 2015 U.S. App. LEXIS 8113, *1-2 (4th Cir. May 18, 2015); In re KBR, Inc., 744 F.3d 326, 333-34 (4th Cir. 2014). "However, when the jurisdictional facts are inextricably intertwined with those central to the merits, the district court should resolve the relevant factual disputes only after appropriate

discovery." Goldfarb v. Mayor & City Council of Baltimore, 2015 U.S. App. LEXIS 11320,

*11-12 (4th Cir. July 1, 2015).

"The court should grant a Rule 12(b)(1) motion to dismiss 'only if the material

jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of

law.'" Sebelius, 2015 U.S. App. LEXIS 8113 at *1-2 (citing Evans v. B.F. Perkins Co., 166 F.3d

642, 647 (4th Cir. 1999)).

## V. ARGUMENT

A. NASA'S 12(B)(6) MOTION TO DISMISS SHOULD BE DENIED BECAUSE EMAMI HAS
    STATED PLAUSIBLE CLAIMS OF DISCRIMINATION AND RETALIATION IN VIOLATION OF
    TITLE VII.

### 1. Emami Has Properly Alleged That NASA Discriminated Against Him Because of His National Origin and Religion in Violation of Title VII.

As amended, Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits

discrimination against any individual "with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2. This prohibition applies to federal agencies such as NASA. 42

U.S.C. § 2000e-16(a).

To overcome a 12(b)(6) motion to dismiss, a Title VII plaintiff must "allege sufficient

facts to show that the defendants terminated his employment 'because of' his [race, color,

religion, sex or national origin]." Ramos v. Molina Healthcare, Inc., 2015 U.S. App. LEXIS

4104, *12 (4th Cir. 2015) (citing Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190-91 (4th Cir.

2010) and Francis v. Giacomelli, 588 F.3d 186, 195 (4th Cir. 2009)). In other words, the plaintiff

must allege that his "race, color, religion, sex, or national origin was a motivating factor for an

employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-

2(m). He need not establish a prima facie case of employment discrimination under McDonnell

Douglas v. Green, 411 U.S. 792 (1973) to survive a 12(b)(6) motion. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002); Jensen-Graf v. Chesapeake Employers' Ins. Co., 2015 U.S. App. LEXIS 10870, *3 (4th Cir. June 26, 2015); McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 584-85 (4th Cir. 2015); Craddock v. Lincoln Nat'l Life Ins. Co., 533 F. App'x. 333, 335 (4th Cir. 2013) (vacating dismissal where district court applied McDonnell Douglas standard).

The Fourth Circuit Court of Appeals has held that it is procedurally improper to consider an employer's proffered legitimate nondiscriminatory reasons in deciding a 12(b)(6) motion to dismiss. Bala, 532 F. App'x. at 335.

Emami's Amended Complaint establishes that he belongs to two protected categories under Title VII as an individual who was born in Iran and who practices the religion of Islam. Am. Compl. ¶¶ 27-28. The Amended Complaint further establishes that at all times during his employment, Emami performed his job in accordance with NASA's legitimate expectations, as demonstrated by the fact that he was rated as "Fully Successful" or higher on every criterion of every performance evaluation from 2002 until 2012. Am. Compl. ¶¶ 43-59. Emami was consistently awarded step increases based on his performance, and was never subject to any form of discipline until January 2013. Am. Compl. ¶¶ 42, 60. Moreover, during the 2012-2013 performance year, Emami successfully and sufficiently performed his duties by obtaining preliminary results of a set of analyzed data, installing sensors, configuring files, setting up technical parameters, setting up the computer system, preparing clear and concise instructions and schematics for the technicians, and performing vital tests on the Test Apparatus. Am. Compl. ¶¶ 108, 115-116.

Emami was subjected to an adverse employment action when Rock terminated him from his position as an Aerospace Engineer. Am. Compl. ¶ 150. In his Amended Complaint, Emami alleges sufficient facts to show that Rock made this decision because of his national origin and religion. Am. Compl. ¶¶ 65-77, 82, 88-89, 94-96, 101-106, 114-117, 118-121, 124, 126-127, 132, 140-149, 158-156, 158-166, 182-185. Emami alleges that Rock accused him of failing to get along with his coworkers and having "communication problems," despite the fact that every performance review from 2002 to 2012 stated that Emami collaborated well with other employees and maintained cooperative, respectful working relationships with his coworkers. Am. Compl. ¶¶ 58-59, 82, 164-65. The Amended Complaint further alleges that Rock demonstrated a discriminatory animus toward Emami by asking him, "Don't you like this country?" and telling him "you people" i.e., Iranian Muslims are "combative." Am. Compl. ¶¶ 66-69. Similarly, Rock mocked Emami during the PIP period by feigning that he could not understand Emami's words because his accent was too thick. Am. Compl. ¶ 148. Rock further displayed his animus by cutting the funding for several of Emami's projects and travel, thus depriving him of vital professional opportunities that were provided to other, non-Muslim and non-Iranian employees. Am. Compl. ¶¶ 75-76.

Rock and NASA denied Emami several opportunities to obtain promotions, transfers, and details, which opportunities were then awarded to less qualified employees who were not Iranian-American or Muslims. Am. Compl. ¶¶ 79-90. Rock and other NASA employees claimed that Emami was "not a good fit" for the promotions, transfers, or details for which he applied because he "speak[s] with an accent" and has "communication problems." Am. Compl. ¶ 82.

Emami's Amended Complaint alleges that Rock intentionally set up Emami for termination by holding him responsible for the functionality of the IDRL and demanding that

Emami produce and report scientific "results and findings" – assignments that were impracticable and nearly impossible to complete. Am. Compl. ¶¶ 94-95, 98-117. Rock then subjected Emami to a PIP under circumstances where other, non-Muslim and non-Iranian employees were treated more favorably. Am. Compl. ¶¶ 118-120. During the PIP period, Rock altered the standards of the PIP, added requirements, and changed the standards by which Emami's performance would be judged. Am. Compl. ¶¶ 124, 141-42.

Emami complied with the PIP by submitting weekly reports to Rock, quarterly reports to NASA on February 15, 2013 and February 28, 2013, and additional information in support of his quarterly reports on March 8, 2013. Am. Compl ¶¶ 133-140. These reports contained all of the information required by the PIP. Am. Compl. ¶ 140. Despite Emami's compliance with the PIP, Rock issued a Notice of Removal to Emami on April 12, 2013. Am. Compl. ¶ 150. Rock then made numerous defamatory representations to the Deciding Official, Ambur, to ensure that Emami was terminated. Am. Compl. ¶¶ 158-62.

As a further indication that Rock's decision to terminate Emami was motivated by Emami's national origin and religion, Emami has identified various engineers and researchers whose positions and duties were substantially similar to his own. Am. Compl. ¶¶ 100-01, 112, 114, 117. He has alleged that Rock and NASA treated Middleton, Balla, Baurle, Wilson, Witte, Mason, Vega, and Bagby more favorably than they treated him, despite the fact that his performance was consistently equal or superior to that of Middleton, Balla, Baurle, Wilson, Witte, Mason, Vega, and Bagby. Am. Compl. ¶ 117, 126-27, 182-83.

As stated in the Amended Complaint, Emami has alleged sufficient factual content to allow the Court to draw the reasonable inference that NASA terminated him because of his religion and national origin. Iqbal, 556 U.S. at 678; Coleman, 626 F.3d at 190-91. As such,

Emami has established plausible discrimination claims under Title VII, and NASA's motion to dismiss Counts I and II of the Amended Complaint should be denied.

> **2.** **Emami Has Properly Alleged That NASA Retaliated Against Him Because of His Participation in Protected Activity in Violation of Title VII.**

As amended, Title VII prohibits discrimination against any individual "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Title VII's anti-retaliation provision protects an employee who files an intra-company complaint regarding conduct that he reasonably believes to be a violation of Title VII. See Minor v. Bostwick Labs., Inc., 669 F.3d 428, 438 (4th Cir. Va. 2012); See also EEOC Compliance Manual, Ch. 8-II(B)(1) ("This protection applies if an individual explicitly or implicitly communicates to his or her employer or other covered entity a belief that its activity constitutes a form of employment discrimination that is covered by any of the statutes enforced by the EEOC"). The Fourth Circuit Court of Appeals has recently held that "[p]rotected opposition activities include both 'complaints about suspected violations' and 'staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities.'" Stewart v. Morgan State Univ., 2015 U.S. App. LEXIS 4845, *4 (4th Cir. Mar. 25, 2015) (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005).

To overcome a 12(b)(6) motion to dismiss his Title VII retaliation claim, a plaintiff must "allege sufficient facts to show that the defendants terminated his employment 'because of'" his participation in protected activity. See Ramos v. Molina Healthcare, Inc., 2015 U.S. App. LEXIS 4104, *12 (4th Cir. 2015). In other words, he must show that he would not have been terminated "but for" his participation in protected activity. Univ. of Tex. Southwestern Med. Ctr. v. Nassar,

133 S. Ct. 2517, 2535 (U.S. 2013). As explained above, the plaintiff need not satisfy the strictures of McDonnell Douglas to avoid dismissal. Swierkiewicz, 534 U.S. at 510; Craddock, 533 F. App'x. at 335; Bala, 532 F. App'x. at 335.

Emami's Amended Complaint states that throughout his employment with NASA, he engaged in protected activity by complaining about conduct that he reasonably believed to be a violation of Title VII. Am. Compl. ¶¶ 167-177. Emami lodged numerous internal complaints regarding Rock's discrimination to Rock, to NASA's EEO Office, to OHCM, and to the Deputy Director. Am. Compl. ¶¶ 40, 71-72, 128, 168-170, 172-174. During his conversations with these offices and officials, Emami reported that Rock had questioned his loyalty to the United States and referred to Iranian Muslims as "you people." Am. Compl. ¶¶ 66-69. He told EEO, OHCM, and the Deputy Director that he believed Rock was biased against him because of his national origin and his religion. Am. Compl. ¶¶ 40, 71-72. After Rock issued him an unwarranted PIP, Emami contacted Smith and told her that he did not believe the PIP was issued "in good faith," and requested a mediation to address his concerns. Am. Compl. ¶ 128-29.

Rock was aware of Emami's protected activity, and felt animosity toward Emami because he had reported Rock's conduct. Am. Compl. ¶¶ 130, 164-66, 174-76. Importantly, Rock privately met with the Deciding Official, Ambur, before Ambur issued his final decision regarding Emami's termination and told him about Emami's prior EEO complaints. Am. Compl. ¶ 166. This conversation, and the various misrepresentations Rock made to Ambur regarding Emami, clearly influenced Ambur's decision to uphold Rock's termination of Emami.

The Amended Complaint alleges that Rock retaliated against Emami for reporting his concerns by subjecting him to a Performance Plan that assured his failure and termination (Am. Compl. ¶¶ 94-95, 98-117), by subjecting him to an unwarranted PIP (Am. Compl. ¶¶ 118-120),

by repeatedly altering the standards and requirements of the PIP (Am. Compl. ¶¶ 124, 141-42), and by then terminating his employment under circumstances where other employees – who had not engaged in protected activity – were not terminated (Am. Compl. ¶¶ 150).

In support of his allegation that NASA would not have terminated him but for his participation in protected activity, Emami points to eight similarly-situated engineers and researchers who were treated more favorably. Am. Compl. ¶¶ 100-01, 112, 114, 117, 126-27, 182-83.

Emami has adequately pled his Title VII retaliation claim by alleging sufficient factual content to allow the Court to draw the reasonable inference that NASA terminated him because of his participation in protected activity. Iqbal, 556 U.S. at 678; Coleman, 626 F.3d at 190-91. As such, Emami has stated a plausible retaliation claim under Title VII, and NASA's motion to dismiss Count III of the Amended Complaint should be denied.

### B. NASA's 12(b)(1) Motion to Dismiss Should Be Denied Because This Court has Subject Matter Jurisdiction over Emami's Claims.

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure should be granted only if, after engaging in any necessary fact-finding, the district court determines that the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. Sebelius, 2015 U.S. App. LEXIS 8113 at *1-2; Demetres, 776 F.3d at 272 (citing Arbaugh., 546 U.S. at 514).

This Court has subject matter jurisdiction over Emami's Title VII claims under 42 U.S.C. § 1331, which states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Title VII, which prohibits discrimination in federal employment, is a law of the United States. See 42 U.S.C. § 2000e-16 and 42 U.S.C. § 2000e-5.

This Court also has jurisdiction under 5 U.S.C. § 7703(b)(2), which provides, in relevant part: "Cases of discrimination ... shall be filed under section 717(c) of the Civil Rights Act of 1964 ...within 30 days after the date the individual filing the case received notice of the judicially reviewable action under such section." Section 717(c) of the Civil Rights Act of 1964 allows a federal employee who has experienced discrimination to file a civil action in federal district court. 42 U.S.C. §§ 2000e–16; 2000e-5.

Federal employees who seek to enforce their rights under Title VII must exhaust their available administrative remedies before pursuing an action in federal court. Sebelius, 2015 U.S. App. LEXIS 8113 at *2-3; 42 U.S.C. § 2000e-16(c); Brown v. Gen. Serv. Admin., 425 U.S. 820, 832 (1976). "Exhaustion [with respect to a federal employee] requires that a plaintiff comply with regulatory and judicially-imposed exhaustion requirements, including the requirement to pursue the administrative claim with diligence and in good faith." Sebelius, 2015 U.S. App. LEXIS 8113 at *3.

In its Motion and Memorandum, NASA asks the Court to dismiss Emami's claims for lack of subject matter jurisdiction, but it offers no basis upon which to conclude that it is entitled to dismissal as a matter of law. NASA Memorandum ¶¶ 1, 3, 13-14. It is undisputed that NASA is a federal agency within the United States government that is subject to this Court's Jurisdiction under 42 U.S.C. § 2000e-16(a), Am. Compl. ¶ 17; See PEX 1: NASA Info. At all times relevant to this Complaint, NASA was Emami's employer. Am. Compl. ¶ 15. Emami has properly exhausted his administrative remedies. He timely appealed his termination to the Merit Systems Protection Board. See PEX 2: MSPB Decision at 1. He then appealed the Initial Decision of the MSPB by filing this action within 30 calendar days of December 25, 2014 – the date on which the MSPB's Decision became final – in accordance with 5 U.S.C. § 7703(b)(2)

and the instructions he received from the MSPB. PEX 2: MSPB Decision at 33. Because Emami has exhausted his administrative remedies, this court has jurisdiction over his claims and NASA's 12(b)(1) motion to dismiss should be denied.

## VI.   CONCLUSION

WHEREFORE, because this Court has subject matter jurisdiction over Emami's claims, and because the Amended Complaint states plausible claims of discrimination and retaliation under Title VII, NASA's motion to dismiss Counts I, II and III of the Amended Complaint should be denied.

RESPECTFULLY SUBMITTED,

SAIED EMAMI
By Counsel:

Adam M. Harrison (VSB No. 79345)
Lisa K. Lawrence (VSB No. 34597)
Barbara A. Queen (VSB No. 47314)
Cherie A. Parson (VSB No. 82501)
LAWRENCE & ASSOCIATES
701 East Franklin Street, Suite 800
P.O. Box 495
Richmond, Virginia 23219
Tel.: (804) 643-9343
Fax.: (804) 643-9368
E-mail: aharrison@lawrencelawyers.com

## CERTIFICATE OF SERVICE

I hereby certify that true and accurate copies of the foregoing Memorandum in Opposition to Defendant NASA's Motion to Dismiss and its corresponding exhibits were electronically filed on this 20th day of July, 2015, which sent a notification of such filing to the following individual:

Virginia VanValkenburg
Office of the United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
E-mail: Virginia.VanValkenburg@usdoj.gov
*Counsel for NASA*

Adam M. Harrison (VSB #79345)
LAWRENCE & ASSOCIATES
701 East Franklin Street, Suite 800
P.O. Box 495
Richmond, VA 23219
Tel.: (804) 643-9343
Fax.: (804) 643-9368
E-mail: aharrison@lawrencelawyers.com
*Counsel for Plaintiff*