UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SAIED EMAMI,

        Plaintiff,

v.                          CIVIL ACTION NO. 2:15cv34

CHARLES F. BOLDEN, JR.,
In his official capacity as
Administrator, National Aeronautics
and Space Administration,

        Defendant.

## REPORT AND RECOMMENDATION

This matter arises from an employment discrimination suit filed by Plaintiff, Dr. Saied Emami ("Emami"), a scientist and former employee of the National Aeronautics and Space Administration ("NASA"). On September 29, 2016, Defendant Charles F. Bolden, Jr., in his official capacity as Administrator of NASA, filed a Motion for Summary Judgment (ECF No. 60). NASA argues that the evidence is insufficient to permit a reasonable juror to conclude Emami was terminated as a result of his religion or national origin as he has alleged. See Def.'s Mem. Supp. Mot. Summ. J. (ECF No. 61). The matter was referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(b) of the Federal Rules of Civil Procedure.

After reviewing the depositions, expert opinions, and exhibits in the summary judgment record, this court concludes that Emami has produced sufficient evidence of a similarly situated comparator to establish a prima facie case, and to rebut NASA's proffered non-discriminatory reason for his termination.  But the evidence is insufficient for a reasonable juror to conclude that Emami's different treatment was retaliation for complaints he made to NASA's EEOC officials regarding his immediate supervisor.  Accordingly, the undersigned recommends that the district court GRANT IN PART and DENY IN PART Defendant's Motion for Summary Judgment (ECF No. 60).

## I.  BACKGROUND

### A.  Events leading to Emami's Termination

Emami was employed as an Aerospace Engineer (GS-13) from 2002 to 2013 in NASA's Hypersonic Airbreathing Propulsion Branch ("HAPB"), a subdivision of the Research Directorate of the NASA Langley Research Center.[1] He was born in Iran and is a follower of Islam.  At NASA, Emami worked in the Isolator Dynamics Research Lab ("IDRL"), a testing apparatus constructed to improve the efficiency of hypersonic engines.  Within the IDRL, Emami was responsible for analysis, research, design, testing,

---

[1] The recitation here views disputed facts in the light most favorable to Emami in accord with the appropriate standard of review.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

and evaluation of air-breathing propulsions systems for aerospace vehicles, including the integration of the propulsion system with the airframe. See Pl.'s Position Description (ECF No. 61-1, at 6). Kenneth Rock ("Rock"), Head of the HAPB, was Emami's direct supervisor from 2005 to 2013.

For most of his time at NASA, Emami had received positive annual reviews in his Performance Plan & Appraisals.[2] See Pl.'s 2005-12 Performance Plans & Appraisals (ECF No. 72-5). Specifically, he received at least a "Fully Successful" or "Meets Expectations"[3] rating on each criterion of his job performance up to April 2012. Id. His 2011-12 performance evaluation also included comments such as, "information is usually accurate and effectively presented;" and "[w]ritten materials generally follow NASA's prescribed standards and style and are infrequently returned for substantial revision." See Pl.'s 2011-12 Performance Plan & Appraisal (ECF No. 72-5, at 47). According to Emami's performance standards in 2011-12, he was required to report his research progress "to select branch members" through monthly informal-briefing.[4] See Pl.'s 2011-12

---

[2] A Performance Plan and Appraisal is drafted every year to establish a researcher's specific duties and responsibilities within the Research Directorate and is then used to evaluate their work in accordance with the plan at the end of the performance cycle. NASA's performance cycles run from May 1 to April 30, of each year.
[3] "Fully Successful" and "Meets Expectations" are the functional equivalent; NASA replaced the former with the latter in 2008.
[4] Rock had apparently asked Emami for more frequent updates via email, and stated in his evaluation that Emami failed to comply with multiple

Performance Plan & Appraisal, Performance Standards (ECF No. 72-5, at 46). Despite rating Emami's level of communication as "Meets Expectations," Rock noted in Emami's 2011-12 performance evaluation that Emami did not communicate or document his research well, and had failed to provide requested updates on his progress. See Pl.'s 2011-12 Performance Plan & Appraisal, Performance Narrative (ECF No. 72-5, at 52).

These concerns led Rock to add two additional requirements to Emami's 2012-13 Performance Plan and Appraisal: (1) "[c]ommunicate progress and plans to branch management via weekly email update that summarizes progress & accomplishments from the previous week and plans & goals for the upcoming week," and (2) "[d]evelop a quarterly report, in the format of Power Point charts or written text supported by figures, that communicates research results and findings." Notice of Unacceptable Performance and Opportunity to Improve (ECF No. 61-1); see also Rock Dec. ¶ 4 (ECF No. 61-3). The "Critical Element" description of Emami's job in the IDRL was also modified to require that he "obtain a very highly resolved and highly accurate characterization of the isolator flow-field." 2012-13 Performance Plan (ECF No. 72-6). In response to these new requirements, Emami submitted a letter to Rock complaining

---

informal requests for these more frequent updates. See Pl.'s 2011-12 Performance Plan & Appraisal, Performance Narrative (ECF No. 72-5, at 52).

that he was setting him up to fail. See Pl.'s Letter to Ken Rock (ECF No. 72-14). Specifically, he stated that "ownership of processes" was not under his control and that he could "promise in good faith only what I am capable to deliver." Id. It is undisputed that the IDRL was not fully operational during this time, which led one witness to opine "the IDRL ha[d] not produced any data worth looking at." Capriotti Dep. 14:18-22 (ECF No. 72-9).

Towards the end of the 2012-13 performance cycle, Rock notified Emami that he had failed to satisfy the new reporting requirements outlined in his Performance Plan. See Rock Dec. ¶ 10 (ECF No. 61-3). Specifically, Emami had failed to produce quarterly reports for the first two quarters of the 2012-13 performance cycle and failed to provide weekly updates on his progress. See Notice of Unacceptable Performance and Opportunity to Improve (ECF No. 61-1). Rock consulted with Human Resources and made a decision to place Emami on a Performance Improvement Plan ("PIP") beginning January 18, 2013 for no fewer than thirty days. Rock Dec. ¶ 9 (ECF No. 61-3). Similar to Emami's Performance Plan, the PIP required him to: (1) submit a weekly update to management detailing the tasks [Emami] was performing, and (2) provide a quarterly report of research results and findings containing "enough input/information to cover the first and second quarters [of the

performance cycle] and contain[ing] documentation of the experimental set-up, approach and procedures; the data acquisition and processing methodology; and the analyses conducted toward the research goals and objectives." See Notice of Unacceptable Performance and Opportunity to Improve, at 3 (ECF No. 61-1).

During the PIP, Emami submitted several reports. Although Rock found that none of the reports met acceptable standards, he extended the duration of the PIP twice to allow Emami to revise and improve his submissions. See Rock Dec. ¶ 19 (ECF No. 61-3). After Emami submitted his third report under the PIP, Rock concluded that he failed to meet an acceptable level of performance because he did not comply with the PIP's requirements of communicating research results and findings from the first two quarters through "documentation of experimental set-up approach and procedures; the data acquisition and processing methodology; and the analyses conducted toward the research goals and objectives." Notice of Proposed Removal (ECF No. 61-12); see also Rock Dec. ¶¶ 17-20 (ECF No. 61-3). In describing the reports' deficiencies, Rock claimed that the "content of the quarterly report (item !g) [sic] was not effectively presented in a clear, concise, and well-organized manner." Notice of Proposed Removal, at 4 (ECF No. 61-12). Rock also observed that the reports "reflected initial

6

observations but did not show evidence of inspection, analysis, and insightful exploration expected for a quarterly report." Id. As a result, Rock determined Emami was unable to handle critical aspects of his job at NASA and proposed that Emami be removed from federal service. See id. at 5.

**B.  Emami's Termination from NASA**

Emami's proposed removal was referred to then-Deputy Director of NASA's Research Directorate, Damodar Ambur ("Ambur"). See Notice of Decision, at 1-3 (ECF No. 61-17). As the director of the Research Directorate, Ambur was the official who would ultimately decide whether or not to terminate Emami. In reviewing Rock's proposed termination, Ambur also considered Emami's Resume, Position Description, the PIP, Rock's Notice of Proposed Termination, the three quarterly reports Emami submitted during the PIP, Emami's weekly communications with Rock, and a memo – prepared by human resources and Rock - outlining the remaining deficiencies in Emami's work product. Ambur Dec. ¶ 6 (ECF No. 61-10).

Emami asserts that the copy of Emami's third and final quarterly report ("March 8 submission") Rock provided to Ambur, including schematics and Power Point slides attached to it, were barely legible. See Ambur Dep. 18:13-25, 19:1-8 (ECF No. 72-3). Ambur was not made aware that there were more legible copies of the documents available, although it does not appear he

7

requested any.  Id.  Ambur was also not told about, or provided with a copy of Emami's Test Plan that he submitted to Rock on February 11, 2013, during the PIP.  See id. at 17:18-20.  Ambur did testify, however, that many of the elements demanded in Emami's PIP could have been satisfied by a well-written Test Plan.  Id. at 39:7-12.  And although Ambur stated that he did not have direct contact with Rock while reviewing the proposed removal, it appears that Rock worked with Human Resources to frame the standards under which Emami's work should be assessed. See  Rock  &  Smith  E-Mail  Conversation  (ECF  No.  72-34). Specifically, when confronted by Human Resources with concerns that his assessment standards were beyond the scope of what the PIP required, Rock acknowledged that he did not explicitly identify the standards but that the standard of "technical excellence" should be implied.  Id.

Ambur met with Emami and his attorney to hear objections to the proposed removal.  And while Ambur acknowledged Emami's claims of Rock's discrimination and/or animus towards him, he dismissed them as unsupported by the evidence.  See Notice of Decision (ECF No. 61-17).  In reaching his conclusion, Ambur did not review the work of any other engineers in the IDRL who were being supervised and assessed by Rock.  See Ambur Dep. 71:8-21 (ECF No. 72-3).  Ambur's decision was solely based on the information provided by Rock, which led him to find that Emami

"[had] not consistently performed all of the duties of a Research Aerospace Engineer at a level that supports" his retention. See Notice of Decision, at 3 (ECF No. 61-17). He also noted that Emami's resume showed his research and technical work had decreased over the years. See Ambur Dec. ¶ 15 (ECF No. 61-10). Ultimately, Ambur accepted Rock's proposal and Emami was terminated from his position at NASA effective June 25, 2013. Id.

Emami first sought review of his termination before the Merit Systems Protection Board (MSPB). Following a hearing, the MSPB concluded that Emami's complaints of discrimination were not supported by the evidence he produced and affirmed his termination. As permitted by 5 U.S.C. § 7703(c), Emami timely commenced this action for review of his claims of discrimination.

## C.  Emami's Claims of Discrimination

Emami argues that Rock's purported reason for the termination was pretextual, and that he was actually unfairly scrutinized, and eventually terminated because of his religion (Islam) and national origin (Iranian). He testified that he visited the Equal Employment Opportunity ("EEO") office several times prior to being placed on the PIP, and complained that Rock was discriminating against him based on his national origin and religion. See Emami Dep. 82:8-25, 83:1-9 (ECF No. 72-32).

Andrea Bynum, an EEO counselor at the Langley Research Center, testified that she did not recall Emami ever mentioning his religion or national origin as the source of the discrimination he perceived. See Bynum Dep. 11:20-25, 12:1 (ECF No. 61-18). The EEO director at NASA also stated that Emami never initiated a formal complaint, and his informal conversations with the office did not assert claims of discrimination based on his protected classifications. Sellars Dec. ¶¶ 3-4 (ECF No. 61-14). But Emami stated that he told the EEO counselors that Rock had "questioned his patriotism by asking 'don't you like this country,' and had stated 'you people are combative'," statements he viewed as discriminatory.[5]   Emami Dep. 74:17-25, 75:1-2; 78:16-22 (ECF No. 72-32).   And both Bynum and Sellars acknowledged that Emami contacted the office frequently expressing a desire "to be heard," and proclaiming knowledge of his "rights."   Sellars Dec. ¶ 3 (ECF No. 61-14); Bynum Dep. 11:3-18 (ECF No. 61-18).

Emami also points to the disparate treatment between himself and other scientists at NASA as evidence of Rock's discriminatory intent.   Along with Emami, there were at least four additional aerospace engineers regularly working in the IDRL: Jeffrey Balla ("Balla"), Robert A. Baurle ("Baurle"), Troy

---

[5] Emami's recollection of the "combative" statement is that it was in either 2011 or 2012.  Emami Dep. 81:14-19 (ECF No. 72-32).

F. Middleton ("Middleton"), and David Witte ("Witte"). All four are natural born U.S. citizens and non-Muslims. Baurle, Middleton, and Witte were also supervised by, and reported to Rock. While they were all governed by the same NASA protocols for research (i.e., the requirement to have a research and/or test plan), Rock did not impose the same reporting requirements (i.e., frequency of updates) on Baurle, Middleton, or Witte as he did on Emami. Rock testified that none of these engineers were required to submit quarterly reports to him. See, e.g., Rock Dep. 46:10-15 (ECF No. 72-4). He stated that they did not need enhanced reporting requirements like Emami's because he (Rock) was getting the information he needed from them in other ways. See Rock Dep. 99:2-12 (ECF No. 72-4). Middleton, for example, did not provide information to Rock in the form of a report, but would share it orally or via e-mail. See id. at 46:10-25.

In addition to alleged direct-hostility and disparate treatment from Rock, Emami also argues that "[a]n objective review of [his] quarterly reports" shows that he complied with all the requirements of the PIP and that his job performance was substantially similar or even superior to other Aerospace Engineers working in the IDRL under Rock. See Pl.'s Mem. Opp. Def.'s Mot. to Exclude at 3 (ECF No. 79). To support his claims, Emami retained two expert witnesses, Dr. Jose L. Goity

("Goity") and Dr. Farid H. Miandoab ("Miandoab"), to testify as to "(1) whether Emami's work product was consistent with the standards of the scientific community; and (2) whether Emami's work product was substantially similar to that of his comparator employees." Id. at 2.

> 1.  Objective Quality of Emami's Work Product

With respect to the objective quality of Emami's work, his experts concluded in their reports that Emami's work-product complied with the PIP's requirements - using their knowledge of the commonly-accepted standards for scientific research and reporting as a metric for assessment - especially in light of the operational status of the IDRL at the time. See Miandoab Report at 8 (ECF No. 66-1); Goity Report at 7-8 (ECF No. 66-2). Emami also argues that their conclusions show that he should never been placed on a PIP because his work was of an objectively acceptable quality during the 2012-13 performance cycle and before then.

Miandoab stated that, after reviewing Emami's quarterly reports, Test Plan, and Research Plan, he was "not able to find a single cause to justify as to why the manager claimed that in his opinion it would be 'impossible to gauge the Plaintiff's research efforts' based on the Plaintiff's Work Product." Miandoab Report at 9 (ECF No. 66-1). Miandoab further opined that the "research and test plans were organized in a very

logical and comprehensive fashion," and that Emami clearly explained his plan and efforts to obtain test data in his quarterly reports.  Id.  Goity's analysis was more detailed, breaking down Rock's requirements into four categories and then labeling which of Emami's exhibits complied with the respective requirements.  See Goity Report, Table 1.0 (ECF No. 66-2).  For each element, Goity identified at least one document that was provided during the PIP period that complied with Rock's requirements.  Id.  Both experts concluded that, given the operational status of the IDRL, Emami could not realistically be expected to produce data that complied with Critical Element 1 of his revised job requirements.  See Goity Report at 6 (ECF No. 66-2); Miandoab Report at 6 (ECF No. 66-1).[6]

2.   Comparator Co-Workers

Miandoab also compared Emami's work with that of Troy Middleton, who was the Research Project Lead for the IDRL. Middleton, like Emami, was required by NASA protocol LMS-OP-7831 to maintain a research and test plan.  Middleton's Performance Plan and Appraisal also specified that he was required to, among other things, "[m]aintain current research plan for the IDRL" and "[c]omplete IDRL description documenting lab set up and

---

[6] NASA filed a separate motion seeking to exclude both experts on a variety of grounds.  See Def.'s Mot. to Exclude (ECF No. 65).  By a separate Report and Recommendation, the undersigned has recommended the court deny NASA's motion.

operations, including schematics/drawings/hookup sheets/etc."
Middleton 2012-13 Performance Plan & Appraisal (ECF No. 74-11).
While other scientists in the IDRL were also required to have
research and/or test plans, only Middleton's was available to
Miandoab when he prepared his report. See id. at 10.

After comparing Emami and Middleton's work, Miandoab
concluded that Emami addressed and explained his research with
much greater detail than Middleton. Id. He further commented
that Emami's Test Plan "includes not only the relative
installation and position of each sensor on the different walls
of the test apparatus, but also a detailed description of his
high frequency data-acquisition system." Id. at 10-11.
Conversely, Middleton's Test Plan lacked a description of
instrumentation and data acquisition. Id. at 11. Miandoab
described Emami's work product as "substantially better than his
comparators." Id.

## II.  <u>STANDARD OF REVIEW</u>

Because Emami obtained initial review before the MSPB, NASA
argues that his retaliation claim is subject to a more
differential "arbitrary and capricious" standard under 5 U.S.C.
§ 7703(c). See, <u>Monk v. Potter</u>, 723 F. Supp. 2d, 860, 872-73
(E.D. Va. 2010). But the statute cited specifically provides
that claims of discrimination appealed from the MSPB are
reviewed by the district court <u>de novo</u>, <u>id.</u> at 872, and the

arbitrary and capricious standard applies only to non-discrimination claims raised in the same complaint. Id. at 813. In this case, Emami's retaliation claim is a claim of discrimination subject to de novo review in this court, because the protected activity he is alleged to have engaged in related to complaints of discrimination under Title VII. Luther v. Guttierrez, 618 F. Supp. 2d 483, 490-91 (E.D. Va. 2009). As a result, this court owes no deference to the MSPB decision, but may consider facts developed in that administrative record in evaluating NASA's motion for summary judgment. Monk, 723 F. Supp. 2d at 872.

Federal Rule of Civil Procedure 56 requires the Court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the Court of the basis of its motion and

identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25. When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## III. ANALYSIS

### A. Title VII Claims of Intentional Discrimination

To proceed to trial on his two Title VII claims, Emami must produce sufficient evidence from which a reasonable juror could conclude that NASA's decision to terminate him was impermissibly based upon his national origin or religion. Young v. Lehman,

16

748 F.2d 194, 196 (4th Cir. 1984).  This evidence may be either direct or indirect.  Direct evidence includes such things as discriminatory statements made by a relevant decision maker from which a jury could infer a discriminatory motive.  Taylor v. Virginia Union Univ., 193 F.3d 219, 232 (4th Cir. 1999) (en banc).  Indirect proof requires evidence on all of the elements of Plaintiff's prima facie case of discrimination.  Under this theory, Emami has the burden to establish (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was performing his position at a level that met NASA's legitimate expectations, and (4) that similarly situated employees outside the protected class received more favorable treatment.  Coleman v. Maryland Court of Appeals, 616 F.3d 187, 190 (4th Cir. 2010); Karpel v. Inova Health System Services, 134 F.3d 1222, 1228 (4th Cir. 1998).

If Emami succeeds in establishing a prima facie case of discrimination, the burden shifts to NASA to articulate a legitimate nondiscriminatory reason for his firing.  Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 285 (4th Cir. 2004).  If NASA meets this burden, Emami must then introduce sufficient evidence from which a jury could conclude that NASA's stated reason was merely a pretext for its intentional discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973).  "A plaintiff's prima facie case,

combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148 (2000).

Emami's direct evidence of discrimination is scant. He testified that he spoke openly about his faith, and that he believed most of his co-workers knew he was a Muslim. Emami Dep., 88:18-24, 212:11 – 213:15. He also directly attributes two statements he considered explicitly hostile to his superior, Rock. Emami claims these statements demonstrate discriminatory animus. First, Rock asked Emami "Don't you like this country," a statement Emami perceived as critical of his national origin. Emami told Rock that he was offended by the statement. Emami Dep., 70:18, 70:7-22. In another exchange, Emami claims Rock told him "you people are combative," a reference, according to Emami, to stereotypical images of Muslims. Emami Dep., 74:13 – 76:10. Rock denies having made either of these statements, but even accepting them as true, they are likely insufficient – standing alone – to meet Emami's burden on summary judgment. Granting Emami all inferences in his favor, it is possible that a reasonable juror might conclude the statements related to his protected characteristics of religion and national origin, but the statements are not directly related either temporally or in

substance to "the complained of adverse employment decision." Arthur v. Pet Dairy, 593 Fed. Appx. 211, 219 (4th Cir. 2015).

Although his direct evidence of discrimination by itself is insufficient to survive summary judgment, Emami has also produced indirect evidence of discrimination by identifying several co-workers whom he identifies as similarly situated comparators outside his protected classifications. Emami contends these similarly situated scientists were evaluated less critically, and allowed to retain their positions despite reporting which was similar if not inferior to his own.

In order to proceed under the McDonnell Douglas burden shifting framework by relying on disparate treatment of co-employees, Emami is required to show that his comparators "are similar in all relevant respects." Haywood v. Locke, 387 Fed. Appx. 355, 359 (4th Cir. 2010). This requires showing that the comparators "dealt with the same supervisor, [were] subject to the same standards, and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

All four of Emami's alleged comparators, Baurle, Balla, Witte, and Middleton, were aerospace engineers who worked along with Emami in the IDRL as research scientists. All four were

19

born in the United States and are non-Muslim. And although all four were research scientists, who were required to comply with a performance plan which included the design, implementation and documentation of research in the lab, none were required to make quarterly written reports to their supervisor, and none were placed on a PIP which required them to "obtain a very highly resolved and highly accurate characterization of the isolator flow field," or report to their supervisor "in the format of Power Point charts or written text supported by figures, that communicates research results and findings." 2012-13 Performance Plan (ECF No. 72-6). In addition, none of the four were terminated or disciplined as a result of their research documentation.

NASA does not dispute that the four comparators were also engaged in research in the IRDL and that none were subject to the same reporting requirements or PIP, which eventually resulted in Emami's termination. But, the agency argues that none of the comparators are sufficiently comparable to Emami to provide evidence of discrimination. Primarily this is the result, NASA claims, of differences in their GS ratings, research specialty and reporting relationships. For purposes of summary judgment, however, it is sufficient to note that accepting the facts in the light most favorable to Emami, he has

identified at least one comparator[7] outside his protected class who shares "enough common features . . . to allow [for] a meaningful comparison." Haywood, 387 Fed. Appx. At 360 (quoting Humphries v. CBOCS West, Inc., 474 F.3d 387, 405 (7th Cir. 2007).

Troy Middleton was a research scientist in the IDRL, which was a relatively small subgroup of researchers within NASA's research directorate. Like Emami, he was an aerospace engineer, charged with setting up experiments in the IDRL and reporting on his test plans and results as the lab became operational. Like Emami, Middleton also reported directly to Rock. The only documented differences which NASA relies on to distinguish Middleton are that he was a GS-14, whereas Emami was a GS-13, and that Middleton was designated as a project lead in the IDRL. Middleton himself testified, however, that this one-level rating distinction had no meaningful impact on the work researchers performed. See Middleton Dep. 70:17 - 71:17 (ECF No. 72-40).

---

[7] By separate motion in limine (ECF No. 69), NASA sought to exclude all evidence of the four comparators. As set forth above, this Report concludes that Middleton is an appropriate comparator and therefore recommends the district court DENY IN PART the motion in limine. The other three comparators have significant differences which make their treatment by NASA less relevant as comparative evidence. Balla, for example, did not report to Rock, and Baurle and Witte are both GS-15s, and did not regularly conduct testing in the IDRL. See Brown Dec. ¶¶ 8(a), 8(b)-(d) (ECF No. 86-1). If the recommendation in the remainder of this report is adopted, Emami may present evidence of Middleton as a similarly situated comparator, but the undersigned leaves for the trial judge the admissibility of any additional comparator evidence in light of their cited dissimilarities and considerations of cumulative proof best evaluated at trial.

It is also undisputed that Middleton was not required to prepare the same detailed reporting imposed as a requirement of Emami's 2012-13 performance plan. Throughout most of 2012-13, Middleton reported to Rock on a bi-weekly basis through emails of a short checklist he updated bi-weekly. Middleton emails, (ECF No. 52), Middleton Dep. 28:17 - 29:4 (ECF No. 40). Although Middleton did co-author an article for other researchers, most of his reporting to his supervisor, Rock, was contained in charts and working drafts. Emami's expert has criticized this reporting as inconsistent with the standards NASA purports to adhere to, separately opining that Emami's reporting was as good or better than the research documentation submitted by Middleton. Miandoab Report at 10-11 (ECF No. 66-1). As a result, Middleton was similarly situated and accepting the facts in the light most favorable to Emami, he was also treated more favorably by NASA.

Emami's evidence is also sufficient to permit a reasonable juror to conclude that his work met the legitimate expectations of his employer. He has produced extensive documentation of his efforts to comply with the revised performance plan and the PIP. In addition to his submissions to Rock, he has produced two highly trained scientists - one with NASA experience - who are prepared to testify that his work met the standards articulated by NASA, given the resources available to Emami.

22

In assessing whether a claimant's work met legitimate expectations, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Evans v. Technologies Applications & Serv. Co., 180 F.3d 954, 960-61 (4th Cir. 1996). But this does not mean that NASA's present claim that Emami's work was substandard is incapable of contradiction. Instead, as he has here, Emami may present evidence of a long history of consistently satisfactory evaluations under the same standards. In addition, he may present expert testimony regarding NASA's legitimate expectations, and his own performance in light of those expectations. See King v. Rumsfeld, 327 F.3d 145, 149-50 (4th Cir. 2003).

Emami's evidence must be evaluated in the context of his ten-year record of satisfactory performance. As recently as his 2011-12 performance evaluation, Emami's work was characterized by the Agency as "usually accurate and effectively presented." It appears that Rock may now testify that his earlier reviews were too generous – but his history of positive evaluations, combined with the uniquely burdensome reporting requirements he imposed during a time when the testing apparatus was inoperable are sufficient for a reasonable juror to conclude that the extensive scrutiny purportedly underlying Emami's termination was not a legitimate expectation, or that his performance

23

satisfied it to the degree made possible by the resources provided. When, as here, an employer asserts that job expectations have not been met, "nothing prohibits the employee from countering this assertion with evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 517 (4th Cir. 2006); King, 328 F.3d, at 149-50. Again, this report expresses no final opinion on whether NASA's requirements were in fact legitimate, or whether Emami's performance met them. But accepting the evidence on summary judgment in the light most favorable to Emami, he has created a question of fact on both issues.

Finally, the same evidence which would permit a reasonable juror to conclude Emami's work met legitimate expectations, would also establish that NASA's proffered reason for the termination – that he did not meet expectations – was pretextual. The only reason NASA offered for Emami's termination was his performance under the revised reporting requirements Rock imposed. His experts have opined that these requirements were either impossible to meet based on the operational status of the IDRL, or satisfied by Emami's reporting of his research efforts. In addition, contemporaneous emails between Rock and NASA's H.R. professionals suggested that they were having difficulty documenting shortcomings in his

24

performance given the lack of recognized standards for the evaluation of his research. Email, Rock to Smith (ECF No. 72-34).

Proof of a prima facie case, coupled with evidence that an employer's proffered reason for the termination is false, may be sufficient for a reasonable juror to conclude Emami's termination is discriminatory. Reeves, 530 U.S. at 148. Combined with Emami's evidence of Rock's comments to him, and his frequent complaints about his treatment, the direct and indirect evidence he has produced in response to NASA's motion for summary judgment is sufficient to create a jury question on his claims of intentional discrimination.

## B.  Title VII Retaliation Claims

In addition to prohibiting discrimination, Title VII's anti-retaliation provision was enacted to "prevent an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." Burlington N. & Santa Fe R.Y. Co. v. White, 540 U.S. 53, 63 (2006); 42 U.S.C. § 2000e-3(a). To survive summary judgment on his retaliation claim, Emami must demonstrate three elements:  (1) that he engaged in protected activity; (2) that his employer took an adverse employment action against him; and (3) that there was a causal link between these two events. Boyer - Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th

Cir. 2015) (en banc). Protected activity includes activity which opposes any practice made unlawful under Title VII. DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015). The Fourth Circuit takes an expansive view of opposition conduct. Thus, "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." DeMasters, 796 F.3d at 420 (quoting Crawford v. Metro Government of Nashville and Davidson Cty., 555 U.S. 271, 281-82 (2009) (Alito, J. concurring)).

In this case, even resolving disputes of fact in favor of Emami, he has not presented sufficient evidence to survive summary judgment on his retaliation claim. While it is undisputed that Emami regularly complained to NASA's EEOC representatives regarding his supervisor Rock, those officials described his complaints as more in the nature of unhappiness about his work and a desire to transfer to a position with more administrative responsibilities. Both EEOC representatives testified that Emami did not explicitly complain to them that Rock's treatment of him related to his religion or natural origin. Bynum Dep. 11:20-25; 12:1 (ECF No. 61-18); Sellars Dec. ¶ 3 (ECF No. 61-14). Emami, by contrast, testified that he specifically accused Rock of discriminating against him on the

basis of his national origin and religion.  See Emami Dep. 82:8-85:9.  He also claims to have reported the hostile statements he attributes to Rock, which Emami felt impugned his national origin and religion.  See id. at 74:17-75:2, 78:16-22.  Thus, accepting his testimony, a reasonable juror might conclude he had engaged in protected activities by complaining to NASA's EEOC officials about Rock's treatment of him.

Emami also satisfies the second element of a prima facie retaliation claim.  He was first disciplined and eventually terminated.  If related to his complaints of discrimination, either of these might have "dissuaded a reasonable worker from making or supporting a charge of discrimination" and are thus materially adverse actions.  Burlington Northern & Santa Fe Ry. V. White, 548 U.S. 53, 68 (2006).

But Emami's retaliation claim founders on the third element of his prima facie case, because he has not produced any evidence from which jurors could conclude the first two elements were causally connected.  Even accepting Emami's statements that he complained of discrimination to NASA's H.R. staff, there is no evidence that Rock knew of such complaints at the time he modified Emami's performance plan, or recommended his termination.  Bynum Dep. 18:10-19 (ECF No. 61-18).  Although Emami's complaints generally preceded his termination, their temporal proximity alone is insufficient to meet Emami's burden

on summary judgment. Jones v. Constellation Energy Proj. & Servs. Grp., Inc., 629 Fed. Appx. 466, 469-70 (4th Cir. 2015) (holding that nine months lapse between internal complaints of discrimination and termination was insufficient to support retaliation claim). Emami's testimony about when he complained to EEOC officials is vague, but he described Rock's allegedly hostile statements as occurring at least a year prior to his termination. Emami Dep. 80:4-22; 81:14-19 (ECF No. 72-32). In addition, he has not identified any other evidence of discriminatory animus by Rock after his alleged reporting to Bynum which might sustain his burden to show a retaliatory motive despite this passage of time. See, Lettieri v. Equant, Inc., 478 F.3d 640, 650 (4th Cir. 2007) (reversing summary judgment on retaliation claim where claimant's evidence "could reasonably be viewed as exhibiting retaliatory animus" by terminating decision maker during seven-month period following protected activity). Accordingly, Emami's evidence of retaliation is insufficient to survive summary judgment and the court should grant in part NASA's motion and dismiss this claim.

## IV.  RECOMMENDATION

For the foregoing reasons this report recommends the court GRANT IN PART and DENY IN PART NASA's Motion for Summary Judgment (ECF NO. 60), DISMISS the retaliation claim and DIRECT the parties to proceed to trial on Emami's claim of intentional

discrimination.   Further,  the  court  should  DENY  IN  PART  NASA's Motion  in  Limine  (ECF  No.  69)  to  exclude  evidence  of  comparator employees,   and   consider   further   objections   to   comparator evidence at trial.

## V. REVIEW PROCEDURE

By  copy  of  this  Report  and  Recommendation,  the  parties  are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the  Clerk  written  objections  to  the  foregoing  findings  and recommendations  within  fourteen  (14)  days  from  the  date  of mailing  of  this  Report  to  the  objecting  party,  28  U.S.C.  § 636(b)(1)(C),  computed  pursuant  to  Rule  6(a)  of  the  Federal Rules  of  Civil  Procedure.   A  party  may  respond  to  another party's  objections  within  fourteen  (14)  days  after  being  served with a copy thereof.

2.   A  district  judge  shall  make  a  de novo  determination of those   portions   of   this   report   or   specified   findings   or recommendations to which objection is made.

The   parties   are   further   notified   that   failure   to   file timely  objections  to  the  findings  and  recommendations  set  forth above  will  result  in  waiver  of  right  to  appeal  from  a  judgment of   this   court   based   on   such   findings   and   recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433

29

(4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th

Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge
_____
DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

December 20, 2016