UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SAIED EMAMI,

      Plaintiff,

v.                                             ACTION NO. 2:15cv34

CHARLES F. BOLDEN, JR.,
In his official capacity as
Administrator, National Aeronautics
and Space Administration,

      Defendant.

<u>REPORT AND RECOMMENDATION</u>

    This matter arises from an employment discrimination suit filed by Plaintiff, Dr. Saied Emami ("Emami"), a scientist and former employee of the National Aeronautics and Space Administration ("NASA"). On October 6, 2016, Defendant Charles F. Bolden, Jr. ("Bolden"), Administrator of NASA, filed a Motion to Exclude Plaintiff's Experts (ECF No. 65). Bolden argues that Emami's experts should be excluded because they are not qualified, their opinions are unreliable, and their testimony would not be helpful to the jury. <u>See</u> Def.'s Mem. Supp. Mot. to Exclude Pl.'s Experts (ECF No. 66). The matter was referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(b) of the Federal Rules of Civil Procedure. Having

1

considered the pleadings and arguments presented, for the reasons stated below, the undersigned RECOMMENDS the district court DENY Defendant's Motion.

## I.   BACKGROUND

The asserted relevance of expert testimony in this employment dispute depends on the technical nature of Emami's work. He was employed as an Aerospace Engineer (GS-13) from 2002 to 2013 in NASA's Hypersonic Airbreathing Propulsion Branch ("HAPB"), a subdivision of the Research Directorate of the NASA Langley Research Center.  Emami worked in the Isolator Dynamics Research Lab ("IDRL"), a testing apparatus constructed by NASA to improve the efficiency of hypersonic engines.  Kenneth Rock ("Rock"), Head of the HAPB, was Emami's direct supervisor.

For most of his time at NASA, Emami had received positive annual reviews, but Rock claimed that his work began to fall below acceptable standards in the 2011-12 performance year.[1] Specifically, he asserts that Emami did not communicate or document his research well and had failed to provide requested updates on his progress. See Pl.'s 2011-12 Performance Plan & Appraisal (ECF No. 61-2).  As a result, Rock added two additional requirements to Emami's 2012-13 Performance Plan and

---

[1] NASA's performance cycles run from May 1 to April 30, of each year.

Appraisal[2]: (1) "[c]ommunicate progress and plans to branch management via weekly email update that summarizes progress & accomplishments from the previous week and plans & goals for the upcoming week," and (2) "[d]evelop a quarterly report, in the format of Power Point charts or written text supported by figures, that communicates research results and findings." Notice of Unacceptable Performance and Opportunity to Improve (ECF No. 61-1); see also Kenneth Rock Dec. ¶ 4 (ECF No. 61-3).

By the mid-point of the 2012-13 performance year, Rock claimed that Emami had failed to satisfy the new reporting requirements outlined in his Performance Plan. See Rock Dec. ¶ 10 (ECF No. 61-3). Rock consulted with Human Resources and made a decision to place Emami on a Performance Improvement Plan ("PIP") beginning January 18, 2013. Id. at ¶ 9. Similar to Emami's Performance Plan, the PIP required him to: (1) submit a weekly update to management detailing the tasks [Emami] was performing, and (2) provide a quarterly report of research results and findings containing "enough input/information to cover the first and second quarters [of the performance cycle] and contain[ing] documentation of the experimental set-up, approach and procedures; the data acquisition and processing

---

[2] A Performance Plan and Appraisal is drafted every year to establish a researcher's specific duties and responsibilities within the Research Directorate and evaluate their work from the previous performance cycle.

methodology; and the analyses conducted toward the research goals and objectives." See Notice of Unacceptable Performance and Opportunity to Improve, at 3 (ECF No. 61-1).

After Emami submitted three reports under the PIP, Rock concluded that he failed to meet an acceptable level of performance because he did not comply with the PIP's requirements of communicating research results and findings from the first two quarters through "documentation of experimental set-up approach and procedures; the data acquisition and processing methodology; and the analyses conducted toward the research goals and objectives." See id.; see also Rock Dec. ¶¶ 17-20 (ECF No. 61-3). As a result, Rock determined Emami was unable to handle critical aspects of his job at NASA and proposed that Emami be removed from federal service. See Notice of Proposed Removal, at 5 (ECF No. 61-12). Emami's proposed removal was referred to the Deputy Director of NASA's Research Directorate, Damodar Ambur ("Ambur"), who ultimately approved Rock's recommendation for removal. See Notice of Decision, at 1-3 (ECF No. 61-17). Emami was terminated from his position at NASA effective June 25, 2013. See id. at 3.

Emami intends to prove that Rock's purported reason for the termination was pretextual - that he was actually scrutinized closely, and eventually terminated because of his religion (Islam) and national origin (Iranian). Emami alleges that "[a]n

4

objective review of [his] quarterly reports" shows that he complied with all the requirements of the PIP and that his job performance was substantially similar or even superior to other Aerospace Engineers working in the IDRL under Rock. See Pl.'s Mem. Opp. Def.'s Mot. to Exclude at 3 (ECF No. 79). To support his claims, Emami retained two expert witnesses, Dr. Jose L. Goity ("Goity") and Dr. Farid H. Miandoab ("Miandoab"), to testify as to "(1) whether Emami's work product was consistent with the standards of the scientific community; and (2) whether Emami's work product was substantially similar to that of his comparator employees." Id. at 2.

Goity has a PhD in Physics and is a research scientist at the Jefferson Laboratory in Newport News, Virginia. See Dr. Jose Goity CV (ECF No. 66-2). Goity also works as a physics professor at Hampton University and has published over eighty scientific papers and reports in his career. Id. Miandoab has a PhD in Mechanical Engineering emphasizing Aerodynamics, and works as an engineering manager for Jamison/HCR Air Door Products Manufacturing. Dr. Farid Miandoab CV (ECF No. 66-1). Miandoab also worked as a NASA contractor, where he managed four engineering services groups and oversaw "systems analysis, performance modeling, conceptual and preliminary design studies, and engineering and safety support." See id. Emami argues that both experts are qualified and will provide relevant testimony

as to whether his work at NASA would be considered objectively acceptable in the scientific community, and how his reporting to Rock compared to the work of his fellow researchers.

NASA argues that Emami's experts should be excluded because they are not qualified by "knowledge, skill, experience, training, or education" to testify about Emami's work at NASA; their opinions are not reliable; and their opinions will not be helpful to the jury. See Def.'s Mem. Supp. Mot. to Exclude (ECF No. 66). NASA also argues that the experts did not properly disclose the information relied upon to form portions of their opinions pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) and thus, the entirety of their testimony should be excluded under Rule 37(c)(1). Id.

After considering the parties' briefs and hearing argument on the motion, the undersigned finds Emami's experts qualified, and that portions of their disclosed testimony may be helpful to the jury. To the extent any of the factual basis for their opinions was not accurately reflected in their initial disclosures, the omission was harmless, and not a basis to preclude them from testifying.

## II. **STANDARD OF REVIEW**

Rule 702 of the Federal Rules of Evidence provides that

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "A district court considering the admissibility of expert testimony exercises a gate keeping function to assess whether the proffered evidence is sufficiently reliable and relevant." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). The "gatekeeping role" serves to ensure that the jury hears what the Federal Rules of Evidence allow in order "for the particularized resolution of legal disputes" in light of the persuasive effect expert testimony may have on jurors. Daubert, 509 U.S. at 597. The relevant inquiry is "'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." Westberry, 178 F.3d at 261 (quoting Daubert, 509 U.S. at 594-95). "Neither FRE 702 nor case law establish a mechanistic test for determining the reliability of an expert's proffered testimony." Pugh v. Louisville Ladder, Inc., 361 F. App'x 448, 452 (4th Cir. 2010) (unpublished). As the Fourth Circuit has noted, "the court should be mindful that Rule 702 was intended to liberalize the introduction of relevant

expert evidence." Id. (citing Cavallo v. Star Enter., 100 F.3d 1150, 1158-59 (4th Cir. 1996)).  Importantly, expert testimony, like all other admissible evidence, is subject to being tested by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Id. (quoting Daubert, 509 U.S. at 596).

## III. ANALYSIS

Both Goity and Miandoab should be able testify at trial, pursuant to Federal Rule of Evidence ("FRE") 702, because they are qualified to opine on the objective substance of Emami's work product as it relates to the requirements imposed on him by NASA, and how his work compares to the work product of his comparator co-workers.  Such testimony is reliable and will be helpful to the trier of fact.  Further, the expert reports do not contravene Federal Rule of Civil Procedure ("FRCP") 26(a)(2)(B) such that exclusion of the testimony under Rule 37(c)(1) is warranted.  For the reasons stated below, the undersigned recommends that the district court DENY Defendant's Motion to Exclude Plaintiff's Experts(ECF No. 65).

**A.  Admissibility under Federal Rule of Evidence 702**

**1.  Qualifications of the Experts**

An expert must be qualified by knowledge, skill, experience, training, and/or education before offering testimony at trial.  See Fed. R. Evid. 702; see also Thomas J. Kline, Inc.

v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989). In this case, Emami has offered Goity and Miandoab as experts to testify as to "(1) whether Emami's work product was consistent with the standards of the scientific community; and (2) whether Emami's work product was substantially similar to that of his comparator employees." Pl.'s Mem. Opp. Def.'s Mot. to Exclude at 2 (ECF No. 79). The court finds that Goity and Miandoab possess satisfactory knowledge, skill, experience, training, and education that qualify them to opine on these issues.

Goity has a PhD in Physics and over thirty years of experience conducting research and analyzing scientific data. See Dr. Jose Goity CV (ECF No. 66-2). In that time, he has published over eighty scientific papers and reports, which would make him intimately familiar with the scientific community's research standards and practices. Id. The quality of his work - and its conformance to scientific research and reporting norms - is evidenced by the fact that he has been cited over 2,600 times. Id. at 8. Moreover, Goity works at the nationally-renowned Jefferson Laboratory as a Senior Staff Scientist and as a Professor of Physics at Hampton University. In both these roles he would necessarily be required to produce or analyze scientific research on a regular basis.

Although Goity's research and experimental work may not be identical to the work performed in the IDRL - a fact Defendant

says disqualifies him from testifying - his experience and knowledge in physics and laboratory experimentation is sufficient to allow him to understand, analyze, and offer an opinion on the objective quality of Emami's reporting.  To that end, the court believes Goity is qualified by knowledge, experience, skill, training, and education to opine on whether Emami's work product met the prevailing standards for scientific research and to compare Emami's work against that of his comparator co-workers.

Similarly, Miandoab's knowledge and experience qualify him to offer testimony on whether Emami's work product met the standards adhered to in the scientific community.  Miandoab was a NASA contractor who served in a supervisory role that oversaw four teams of engineers – a position similar to Rock's.  At least one of the engineering teams he oversaw performed "[s]ubsonic/[s]upersonic/[h]ypersonic vehicle configuration development; [a]erodynamic and structural analysis; and [a]erothermodynamics and thermal loads analysis."  Miandoab CV at 3 (ECF No. 66-1).  By supervising such work for NASA, Miandoab would be particularly familiar with the research and reporting practices of NASA scientists.  And while this specialized familiarity with NASA is not necessary to offer an opinion on the issues identified by Emami, it does make Miandoab particularly qualified to assess whether the research and

reporting standards of the scientific community at large are different than what would reasonably be expected at NASA.

Defendant seeks to distinguish Miandoab's experience at NASA by emphasizing that he oversaw task orders in NASA's Engineering and Safety Center. See Def.'s Mem. Supp. Mot. to Exclude at 8, n. 1 (ECF No. 66). However, Defendant has not identified how this makes Miandoab less qualified to testify about the research and reporting standards of the scientific community. And in any event, Miandoab's CV explains that he also oversaw the work performed pursuant to the task orders. Id. at 2. In other words, the implication by Defendant that Miandoab's position may have been purely logistical is not supported by the evidence. Further, while Miandoab's publication history is less voluminous than Goity's, his experience over the past thirty years appears to be directly related to the preparation, analysis, review, and management of research proposals and experimental reports. This experience - in addition to his knowledge, skills, training, and education - qualifies him as an expert on the issues identified by Emami.

Again, Emami's experts are qualified to testify as to "(1) whether Emami's work product was consistent with the standards of the scientific community; and (2) whether Emami's work product was substantially similar to that of his comparator employees." Pl.'s Mem. Opp. Def.'s Mot. to Exclude at 2 (ECF

No. 79).   It is important to note that neither expert is being offered to testify about the subjective quality or scientific value of Emami's work.   They do not purport to be experts in aerospace engineering.   Rather, their testimony seeks to identify the objective standards observed in scientific research and reporting, whether Emami's reporting - both before and after the PIP - adhered to those standards under the circumstances alleged by Plaintiff, and how Emami's work compares to that of his comparator co-workers.   To the extent that their reports go beyond those issues or offer conclusions reserved for the jury, their testimony may be limited at trial by appropriate contemporaneous objection.   But, because they have sufficient knowledge, skill, experience, training, and education in scientific research and reporting, Emami's proffered experts are qualified under FRE 702 to testify on the issues identified by Plaintiff and quoted above.

## 2.   Reliability of the Experts' Testimony

To be admissible at trial, expert testimony must be reliable.   See Daubert, 509 U.S. at 589.   To be reliable, testimony must be based upon sufficient facts or data, and be the product of reliable principles and methods applied to the facts of the case.   See Fed. R. Evid. 702(b)-(d).   In this case, both Goity and Miandoab's testimony about whether Emami's reporting conformed to the prevailing standards for research and

reporting in the scientific community and how it compared to the work of his comparator co-workers is reliable because their objective conclusions are based on sufficient factual information, and they have properly applied their experience and knowledge in assessing that information.

To begin with, NASA's purported reasons for terminating Emami are relevant to an inquiry into whether Plaintiff's experts utilized sufficient factual information to produce their opinions. Concerning Emami's termination, the Agency wrote:

> NASA terminated Plaintiff for his failure – after repeated attempts – to comply with the PIP's requirement that he provide quarterly report of research results and findings containing "enough input/information to cover the first and second quarters [of the performance cycle] and contain[ing] documentation of the experimental set-up, approach and procedures; the data acquisition and processing methodology; and the analyses conducted toward the research goals and objectives."

Notice of Unacceptable Performance and Opportunity to Improve, at 3 (ECF No. 61-1) (alteration in original).

As stated, these requirements were contained in Emami's Performance Plan, and amplified in the PIP. His failure to comply with the PIP, NASA claims, led to Emami's termination. Defendant argues that Plaintiff's experts did not rely on the correct information that would allow them to conclude Emami met these requirements.

Before detailing the information that Emami's experts did review and why it allowed them to produce reliable conclusions, it is important to note that Emami's argument of employment discrimination – and by extension the purpose of his experts' testimony - is broader than the argument NASA makes in its motion. Emami contends that at all times relevant to his complaint, his work product and reporting met the reasonable standards of the scientific community and was substantially similar to, or surpassed the quality of his comparator co-workers' work. See Pl.'s Mem. Opp. Def.'s Mot. at 3 (ECF No. 79). In other words, Emami contends that he should never have been on a PIP, and that placing him on one was just one step in a series of discriminatory actions by Rock.

Emami argues that his experts can support this claim by testifying as to "(1) whether Emami's work product was consistent with the standards of the scientific community; and (2) whether Emami's work product was substantially similar to that of his comparator employees." Pl.'s Mem. Opp. Def.'s Mot. to Exclude at 2 (ECF No. 79). To address these issues, Goity and Miandoab reviewed "(1) Emami's Performance Plan – which described his job duties for the 2012-2013 performance year; (2) Emami's reports for the 2012-2013 performance period; (3) Middleton's reports; and (4) one of Witte's reports." Id. at 3-4. Miandoab also reviewed more reports from Emami's proffered

14

comparators after NASA was ordered to produce those documents, and supplemented his report via affidavit.  Id. at 4.

Defendant argues that the experts' conclusions are unreliable because they failed to review Emami's position description, the PIP issued by Rock, the notice of proposed removal, and Ambur's notice of decision to approve Emami's removal from federal service.  Without these materials, Defendant claims that Emami's experts could not form an adequate foundation concerning "(1) the basic requirements of Plaintiff's job; (2) the agency's reasoning for placing Plaintiff of the PIP; (3) the specific requirements of the PIP; and (4) the agency's reason for concluding that Plaintiff failed to satisfy the PIP's requirements and should be removed from his position."  Def.'s Mem. Supp. Mot. to Exclude at 10 (ECF No. 66).  Defendant also claims that the experts improperly relied on conversations with Emami to form subjective opinions about his ability to perform work in the IDRL and that they erroneously rely on their general experience with scientific reporting to assess Emami's work.

The crux of Defendant's argument is that Emami was terminated for failing to comply with the PIP and thus, this is the proffered non-discriminatory reason Emami must rebut.  But Emami's claims, and the purpose of his experts' testimony, are not limited to the narrow timeframe or parameters of the PIP.

Emami maintains that being placed on a PIP itself was merely one step in a sequence of discrimination aimed at removing him from NASA. As Emami argues in his opposition to this motion, a full description of Emami's job duties for the 2012-13 performance year as well as the reporting and substantive requirements that Defendant claims Emami failed to meet were included in Emami's 2012-13 Performance Plan. Importantly, it was Emami's alleged failure to satisfy the requirements laid out in his Performance Plan that ultimately led to Rock placing him on a PIP – a decision that Emami alleges was pretext for discrimination. Emami, through his experts, asserts that he did in fact meet the objective standards of scientific reporting throughout the 2012-13 performance year, which he claims is proof that he should not have been on the PIP at all. Nevertheless, he also claims to complied with the requirements in the PIP as well. See Goity Report at 6-7, 7-8, 9 (ECF No. 66-2); Miandoab Report at 8, 9 (ECF No. 9).

While the information identified by Defendant may have been helpful to the experts, their objective conclusions that Emami's work met the accepted standards of scientific reporting and that his work was comparable or superior to that of his co-workers are not unreliable in the absence of that additional information identified by Defendant. Moreover, the underlying requirements by which Emami's performance was assessed after being placed on

the PIP were already included in the documents that the experts reviewed. By comparing Emami's work product (i.e., his Research Plan, Test Plan, and reports) with that of his comparators, the experts could reliably opine on how the two bodies of work compared to one another. Finally, to the extent the absence of specific materials bears on the weight due to the experts' testimony, those shortcomings may be fully exploited by vigorous cross-examination.

In regard to the subjective conclusions that the experts included in their reports - namely that Rock's expectations were intentionally "unrealistic" or "set [Emami] up to fail" because of the status of the IDRL - the experts' testimony should be limited. Emami concedes this fact. See Pl.'s Mem. Opp. Def.'s Mot. at 8-9 (ECF No. 79). Whether the standards imposed on Emami were intentionally unrealistic, in light of the commonly-accepted standards for reporting in the scientific community and the operational status of the IDRL, is a question for the trier of fact to resolve. Notwithstanding that limitation, Emami's experts should be able to testify whether, given the operational status of the IDRL at the time, Emami could reasonably be expected to collect data and produce accompanying reports. See King v. Rumsfeld, 328 F.3d 145, 149-50 (4th Cir. 2005) (Title VII plaintiff may offer expert testimony as to his employer's

legitimate expectations and his performance in light of those expectations).

With respect to the experts' alleged reliance on conversations with Emami regarding the IDRL's status, Defendant's argument does not accurately represent both expert reports.  Contrary to Defendant's claim, Miandoab cites sworn testimony and other evidence related to the status of the IDRL during Emami's tenure that was not solely obtained though conversations with him.  See Miandoab Report at 5-6 (ECF No. 66-1).  Although Goity may only recite Emami's representations as the source for the IDRL's operational status, the objective fact that the IDRL was not fully operational – which may be shown without expert testimony – still allows Goity to opine whether an experimental researcher would be able to collect data and produce reports under such conditions.  In short, Emami did not misrepresent the status of the IDRL and the fact that his expert relied on his representation is not relevant to the objective conclusions the expert reached based on this undisputed operational fact.

In sum, the experts' objective conclusions as to "(1) whether Emami's work product was consistent with the standards of the scientific community; and (2) whether Emami's work product was substantially similar to that of his comparator employees" are reliable because they are based upon sufficient

factual information identified in their reports.   As discussed in the preceding section, Goity and Miandoab are qualified to opine on the prevailing standards of reporting in the scientific community and to objectively assess whether Emami's work product met those standards.   To that end, they used reliable methods of analysis by applying their knowledge and experience to the information reviewed and reached objective conclusions that comply with FRE 702's reliability standards.

   **3.   Helpfulness of the Experts' Testimony**

   Finally under FRE 702, expert testimony must be helpful to the trier of fact as they seek to understand the evidence or determine a fact in issue.   See Fed. R. Evid. 702(a).   In order to be helpful, the testimony must be relevant.   Daubert, 509 U.S. at 591.   In this case, Goity and Miandoab's testimony complies with the "helpfulness" requirement because it will assist the trier of fact in understanding how the highly technical and scientific portions of Emami's reporting and work product conform, where possible, to both the requirements imposed by his Performance Plan, the PIP, and the prevailing standards of research and reporting in the scientific community.

   Defendant argues that the experts' opinions are not helpful or relevant because they offer subjective opinions on reporting requirements imposed by Rock; rely on information not relevant to an assessment under the PIP; and that jurors are able to

independently assess whether Emami's reports complied with the PIP requirements. <u>See</u> Def.'s Mem. Supp. Mot. to Exclude at 15-18 (ECF No. 66). Emami claims that the testimony will be helpful because it will assist the jury in understanding how the substantive portions of Emami's work product comply with Rock's requirements and in assessing whether Rock's stated reasons for recommending termination were genuine. <u>See</u> Pl.'s Mem. Opp. Mot. to Exclude at 11 (ECF No. 79).

The undersigned finds that the experts' testimony is relevant because it would be helpful in assisting the jury understand how the complex scientific information and narratives in Emami's work complied with the applicable standards of reporting. The average juror is not presumed to be able to comprehend and analyze the adequacy of reporting on – for example - "[h]igh frequency pressure Kulites XTL-140-50A model sensors [that] were submitted for calibration in preparation to measure phenomenological physics of the unsteady (time accurate) pressure rise caused by shock boundary layer interaction in the isolator section . . . ."[3] Absent a degree or experience in a field of scientific study, it is reasonable to believe that a juror (or a judge) may find it difficult to understand whether the above quoted information pertained to the setup, approach,

---

[3] The quoted text was excerpted from one of Emami's quarterly reports cited in his opposition to this motion. <u>See</u> Pl.'s Mem. Opp. Mot. to Exclude at 12 (ECF No. 79).

procedures, methodologies, or analyses of Emami's work. The proffered reason for NASA's termination – Emami's alleged failure to report these parameters – is not a matter of common knowledge. Moreover, Emami's self-interested testimony that he believes he complied with the reporting requirements may be insufficient, without expert testimony, to create a question of fact on the subject. See King, 328 F.3d at 149. As evidenced by their breakdown of Emami's reports – particularly the chart compiled by Goity – these two experts will be able to explain how the information in Emami's work fits into each element of his reporting requirements, both before and after the PIP. See, e.g., Goity Report, Table 1.0 (ECF No. 66-2).

With respect to Defendant's claim that the experts' reliance on Emami's collective work product is irrelevant because it considers information that was not part of the decision to terminate Emami, Defendant once again relies on its own narrowed scope of the issues in this case. While NASA may argue that it was purely Emami's objective failure to comply with the PIP that led to removal, he has alleged a much broader claim of discrimination. He argues the PIP itself was discriminatory because his work product met all reasonable standards of scientific research and reporting – and that Rock's decision to place him on a PIP was one step towards achieving a discriminatory goal. To that end, his experts opine, in part,

21

on whether Emami's work product as a whole complied with the job duties and reporting requirements laid out in the 2012-13 Performance Plan. It appears undisputed that Rock relied heavily on Emami's alleged failure to comply with his Performance Plan as justification to place him on a PIP, and that the same reporting requirements featured in the Performance Plan were incorporated into the PIP after that decision was made. If Rock's motives are at issue, a complete review of Emami's work product during the 2012-13 performance cycle – like the one conducted by his experts – would be relevant to the issues in this case.

Finally, as stated in the preceding sections, Defendant's argument that Emami's experts should not offer subjective assessments of Rock's requirements is sustained. And Emami has conceded that such testimony would not be proper. But again, the experts may testify whether, given the operational status of the IDRL, Emami could have reasonably achieved all or some of the requirements established by Rock. Stated differently, they may opine on whether a scientist faced with an inoperable or suboptimal experimental platform could obtain data and conduct analysis that would have complied with the requirements imposed by Rock. If, as his experts claim, Emami could not do so, it will be for the jury to decide whether the requirements were

intentionally unrealistic, and imposed out of discriminatory animus.

## B. Exclusion under Federal Rule of Civil Procedure 26(a)(2)(B) & 37(c)(1)

Federal Rule of Civil Procedure 26(a)(2)(B) requires that an expert report contain, among other things, "the facts or data considered by the witness in forming" their opinion. If a party's expert fails to comply with FRCP 26(a)(2)(B), the court may exclude all or part of the expert's testimony, unless the failure was substantially justified or is harmless. See Fed. R. Civ. P. 37(c)(1); (c)(1)(C); (b)(2)(A)(iii). A proper request for a Rule 37 sanction must be made with "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). In this case, not only did Defendant fail to make any attempt to remedy the alleged Rule 26 violation in accordance with Rule 37(a)(1), the underlying argument itself is without merit.

Defendant argues that both experts failed to disclose information they relied on in formulating their conclusions, citing to portions of their reports describing information received by Emami regarding the functionality of the IDRL. See Def.'s Mem. Supp. Mot. to Exclude at 18-19 (ECF No. 66).

Defendant argues the failure to disclose what information was provided by Emami warrants the exclusion of both experts entirely.  The court disagrees.

First, at least one of the expert reports does identify the factual information that Defendant claims is missing. Miandoab's report explicitly identifies the information he relied upon in concluding that the IDRL was not properly functioning during the relevant times in this suit.  Indeed, Miandoab states ". . . . I asked the Plaintiff for any factual evidence or testimonial to support his claims as to the IDRL facility "leakage" and functionality of the test apparatus.  The Plaintiff submitted to me sworn testimonies of Mr. Diego Capriotti before Merit System Protection Board (MSPB) on May 15, 2014 [See EXHIBIT 14]."  Miandoab Report at 5 (ECF No. 66-1). He goes on to detail how Cappriotti's testimony supports Emami's representations.  Id. at 5-6.  Miandoab further states, "[a]n examination of the scheduled research activities in the IDRL facility in the December 2010 – July 2013 period indicates "Milestone" slippage (See Troy Middleton's EXHIBITS 5, 6, 7, and 8)."  Id. at 6.  Thus, contrary to Defendant's assertion, Miandoab both identified and cited to the sources of information that he based his conclusion upon.  In fact, Miandoab's report indicates that he was critical of Emami's representations by requesting proof of what he was told.  For Defendant to claim

that this description is "sketchy" and "vague" is wholly without merit.

Second, although Goity's report does not explicitly identify the basis for his opinions concerning the IDRL's functionality, the omission is harmless. To begin, the conclusions that Defendant takes issue with – that Rock's requirements were intentionally "unrealistic" or "set [Emami] up to fail" - have been excluded in the preceding sections of this Report. The court, and Emami for that matter, agrees that the experts cannot offer argumentative conclusions about the requirements imposed by Rock. However, the underlying information relied upon to reach those (improper) conclusions – that the IDRL was not fully operational due to "leakage" – is an objective fact that may be proven without expert testimony. And there is no dispute that the IDRL was in fact experiencing functionality issues. Thus, Goity's opinion that a researcher, faced with a suboptimal experimental apparatus, would not be able to produce certain data or analysis is not undermined by his alleged reliance on Emami's statements as evidence of the equipment's operational status.

To conclude, the undersigned finds that Goity and Miandoab's expert testimony is admissible. Both experts are qualified by "knowledge, skill, experience, training, or education" to testify as to "(1) whether Emami's work product

was consistent with the standards of the scientific community; and (2) whether Emami's work product was substantially similar to that of his comparator employees." The experts' proffered testimony on these issues is reliable because they have applied their knowledge and expertise in the field of scientific research to the facts of the case in order to reach their conclusions. This testimony will also be helpful to the trier of fact because it is relevant to ultimate issue of whether Emami was terminated for discriminatory reasons or for failing to document and report his research as NASA alleges. Further, the exclusion of the experts under Federal Rule of Civil Procedure 37(c)(1) is not warranted because their reports did not violate the disclosure requirements of Rule 26(a)(2)(B).

## IV. <u>RECOMMENDATION</u>

Because the experts' testimony complies with Federal Rule of Evidence 702 and exclusion is not otherwise warranted by the Federal Rules of Civil Procedure, the undersigned recommends that the Defendant's Motion to Exclude Plaintiff's Experts (ECF No. 65) be DENIED.

## V. <u>REVIEW PROCEDURE</u>

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and

recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.   A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

                                        /s/
                            Douglas E. Miller
                          United States Magistrate Judge

                          DOUGLAS E. MILLER
                          UNITED STATES MAGISTRATE JUDGE

December 20, 2016